**VIRGINIA INNOVATION SCIENCES, INC., Plaintiff,**

v.

**SAMSUNG ELECTRONICS CO., LTD., et al., Defendants.**

**Case No. 2:12cv548.**

United States District Court, E.D. Virginia, Norfolk Division.

Signed Jan. 8, 2014.

Opinion Denying Reconsideration May 2, 2014.

Aaron W. Purser, Timothy E. Grocho-cinski, W. Ryan Snow, Anthony M. Vec-chione, Claire A. Henry, David C. Hart-nett, Edward E. Casto, Jr., Edward R. Nelson, III, Jonathan H. Rastegar, Joseph P. Oldaker, Thomas C. Cecil, Thomas J. Ward, Jr., for Plaintiff.

Jonathan P. Crawford, Jordan Raphael, Scot C. Rives, Brett J. Williamson, Brian Berliner, Cameron W. Westin, Eric S. Namrow, Marc M. Breverman, Robert W. McFarland, Sanjeev B. Mehta, Sarah K. McConaughy, Susan van Keulen, for Defendants.

## OPINION AND ORDER

MARK S. DAVIS, District Judge.

This matter is currently before the Court on a motion for summary judgment filed by Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung" or "Defendants"). ECF No. 134. The motion has been fully briefed and is therefore ripe for decision.

After examination of the briefs and the record, the Court determines that a hearing is unnecessary, as the facts and legal arguments are adequately presented, and the decisional process would not be aided significantly by oral argument. *See* Fed. R.Civ.P. 78(b); E.D. Va. Loc. Civ. R. 7(J). For the reasons that follow, Defendants' motion seeking summary judgment is **GRANTED,** in part, and **DENIED,** in part.

### I. FACTUAL BACKGROUND

At issue in this case are five[1] patents: U.S. Patent No. 7,899,492 ("the '492 patent"), U.S. Patent No. 8,050,711 ("the '711 patent"), U.S. Patent No. 8,145,268 ("the '268 patent"), U.S. Patent No. 8,224,381 ("the '381 patent"), and U.S. Patent No. 8,135,398 ("the '398 patent"). All of the patents-in-suit claim priority to the '492 patent, which itself claimed priority to provisional application number 60/588,359,

---

**1.** Previously, there were six patents at issue in this case. However, U.S. Patent No. 7,957,-733 ("the '733 patent") is no longer asserted as infringed. Agreed Dismissal Order, ECF. No. 408.

filed on July 16, 2004. The '711, '268, and '381 patents are continuations of the '492 patent and all four share a substantively identical specification ("the '492 specification"). U.S. Patent No. 7,957,733 ("the '733 patent"), which is not at issue in this case, was filed on May 22, 2007 as a continuation-in-part of the '492 patent. The '398 patent is a continuation from the '733 patent. The shared specification of the '733 and '398 patents ("the '398 specification") includes all of the '492 specification along with additional material. It is the addition of this new material which prevents the '398 patent from claiming priority back to the filing of the '492 patent and entitles it to the later priority date of May 22, 2007, the filing date of the '733 patent. Each of the patents-in-suit describes inventions intended to resolve the inconvenience and impracticability of viewing multimedia content on the small screens of mobile terminals.

### A. The '492 Patent Family

The '492, '711, '268, and '381 patents (collectively, "the '492 patent family") are each titled "Methods, Systems and Apparatus for Displaying Multimedia Information from Wireless Communication Networks." Their shared specification and respective claims are directed toward methods, systems, apparatuses, and computer-readable mediums that can be utilized to convert multimedia signals, appropriate for displaying content on a mobile terminal, into signals appropriate for display on an alternative display terminal.

### B. The '398 Patent

The '398 patent is entitled "Methods and Apparatus for Multimedia Communications with Different User Terminals." Its specification and claims are directed toward methods, systems, apparatuses, computer programs, and computer-readable mediums for providing "multimedia content to and from various different devices"

through the conversion and sending or routing of such content. *E.g.,* '398 patent 1:47–49. As noted above, the '398 patent issued from a continuation of the '733 patent, which was itself a continuation-in-part of the '492 patent. *Id.* at 1:21–31. Thus, the '398 patent claims priority to the filing date of the '733 patent, May 22, 2007. However, it may claim priority back to the filing date of the '492 patent for claims the subject matter of which flow directly from the '492 patent. *Tech. Licensing Corp. v. Videotek, Inc.,* 545 F.3d 1316, 1326 (Fed. Cir.2008) ("In essence, [35 U.S.C. § 120] means that in a chain of continuing applications, a claim in a later application receives the benefit of the filing date of an earlier application so long as the disclosure in the earlier application meets the requirements of 35 U.S.C. § 112, ¶ 1, including the written description requirement, with respect to that claim."); *see also, Cordance Corp. v. Amazon.com, Inc.,* 658 F.3d 1330, 1334 (Fed.Cir.2011).

### II. PROCEDURAL HISTORY

In the instant patent infringement action, plaintiff Virginia Innovation Sciences, Inc. (hereinafter "Plaintiff" or "VIS") alleges that Defendants have directly, indirectly, and willfully infringed the patents-in-suit by making, using, offering for sale, selling, and/or importing a wide range of accused products, including smartphones, tablets, Blue-ray players, and hubs. Samsung denies VIS's claims of infringement and asserts several affirmative defenses, including invalidity of all patents-in-suit, prosecution history estoppel and other equitable doctrines. Additionally, Samsung asserts counterclaims seeking declarations of non-infringement and invalidity for each of the patents-in-suit.

The Court held its *Markman* hearing in this matter on June 11, 2013 and issued its *Markman* opinion on September 25, 2013.

ECF No. 198, 976 F.Supp.2d 794 (E.D.Va. 2013). Since the *Markman* hearing, there have been numerous filings in this matter and several motions remain pending before the Court, in various stages of briefing. By Order of October 25, 2013, the Court joined for trial this matter and *Virginia Innovation Sciences, Inc. v. Samsung Electronics Co., Ltd., et al.,* Case No. 2:13cv322. ECF No. 353. The trial of the two matters is now set for April 21, 2014. On November 15, 2013 the Court ruled on Defendants' Motion to Dismiss VIS's Claim for Willful Infringement; granting, in part, and denying, in part such motion. ECF No. 395, 983 F.Supp.2d 700, 2013 WL 6053846 (E.D.Va.2013). The Court found that the claim for willful infringement failed to state a plausible claim for relief with regard to willful infringement of the '711, '268, and '381 patents.

After first reciting the applicable standard of review, the Court will address the Defendants' Motion for Summary Judgment of Patent Invalidity and No Willful Infringement filed August 13, 2013 and the associated responses and briefs. ECF No. 134, 135, 144, 159, 163, and 168.

## III. STANDARD OF REVIEW

### A. Summary Judgment

The Federal Rules of Civil Procedure provide that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The mere existence of some *alleged* factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, the standard at summary judgment requires that the evidence be viewed in favor of the nonmovant and that all justifiable inferences be drawn in his favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

If a movant has properly advanced evidence supporting entry of summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial.[2] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. In doing so, the judge must construe the facts and all "justifiable inferences" in the light most favorable to the non-moving party, and the judge may not make credibility determinations. *Id.* at 255, 106 S.Ct. 2505; *T–Mobile Northeast LLC v. City Council of City of Newport News, Va.,* 674 F.3d 380, 385 (4th Cir. 2012). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Moreover, because a ruling on summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits[,] ... [t]he mere existence of a scintilla of evidence in

---

**2.** "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R.Civ.P. 56(e)(2).

support of the plaintiff's position will be insufficient" to overcome a defendants' well-founded summary judgment motion. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

"In rendering a decision on a motion for summary judgment, a court must 'view the evidence presented through the prism of the substantive evidentiary burden' that would inhere at trial." *Apple Computer, Inc. v. Articulate Sys., Inc.,* 234 F.3d 14, 20 (Fed.Cir.2000) (quoting *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,* 139 F.3d 877, 880 (Fed.Cir.1998) (quoting *Anderson,* 477 U.S. at 254, 106 S.Ct. 2505)). Therefore, the Court must now examine each applicable evidentiary burden.

### B. Patent Invalidity

"Among other defenses under § 282 of the Patent Act of 1952 (1952 Act), an alleged infringer may assert the invalidity of the patent-that is, he may attempt to prove that the patent never should have issued in the first place." *Microsoft Corp. v. i4i Ltd. P'ship,* —— U.S. ——, 131 S.Ct. 2238, 2242, 180 L.Ed.2d 131 (2011) (citing 35 U.S.C. §§ 282(2), (3)). Defendants assert the invalidity of the patents-in-suit.

■ A patent is presumed valid upon issuance from the United States Patent and Trademark Office. 35 U.S.C. § 282. Overcoming this presumption requires the party seeking to invalidate a patent to prove invalidity by clear and convincing evidence. *i4i Ltd. P'ship,* 131 S.Ct. at 2246. This same standard applies at the summary judgment stage. *Invitrogen Corp. v. Biocrest Mfg., L.P.,* 424 F.3d 1374, 1378 (Fed.Cir.2005). Thus, in order to prevail at the summary judgment stage, the party seeking summary judgment on the issue of patent invalidity "must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly & Co. v. Barr Labs., Inc.,*

251 F.3d 955, 962 (Fed.Cir.2001); *Apple Computer, Inc.,* 234 F.3d at 20.

■ Before addressing the factual questions of anticipation and obviousness, the necessary first step in considering patent validity or invalidity is to determine the proper meaning of the relevant disputed claim terms. *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.,* 344 F.3d 1186, 1195 n. 4 (Fed.Cir.2003). As claim construction is a matter of law, *Markman v. Westview, Instruments Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (en banc), summary judgment is particularly appropriate where the only real dispute between parties concerns the proper meaning of patent claims. *See Voice Techs. Group, Inc. v. VMC Sys., Inc.,* 164 F.3d 605, 612 (Fed.Cir.1999) (considering infringement at summary judgment stage). Although *Voice Techs. Group, Inc.* concerns the issue of infringement at the summary judgment stage, the Federal Circuit's reasoning is equally applicable to the issue of patent validity at the summary judgment stage.

#### i. Invalidity Based on Anticipation

■ Patent invalidity due to anticipation under 35 U.S.C. § 102 is a question of fact rather than a question of law. *Enzo Biochem, Inc. v. Applera Corp.,* 599 F.3d 1325, 1331 (Fed.Cir.2010). However, "[w]hile anticipation is a question of fact, it may be decided on summary judgment if the record reveals no genuine dispute of material fact." *Enzo Biochem, Inc.,* 599 F.3d at 1331 (quoting *Leggett & Platt, Inc. v. VUTEk, Inc.,* 537 F.3d 1349, 1352 (Fed.Cir. 2008)).

■ "A determination that a claim is anticipated involves a two-step analysis: 'the first step requires construing the claim,' and '[t]he second step in the analysis requires a comparison of the properly construed claim to the prior art....'"

*Enzo Biochem, Inc.*, 599 F.3d at 1332 (quoting *Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1406 (Fed.Cir. 2004)). "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed.Cir. 2003) (citing *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed.Cir. 1987)). However;

> [i]f the prior art reference does not expressly set forth a particular element of the claim, that reference still may anticipate if that element is "inherent" in its disclosure. To establish inherency, the extrinsic evidence "must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268, 20 U.S.P.Q.2d 1746, 1749 (Fed.Cir.1991). "Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Id.* at 1269, 948 F.2d 1264, 20 U.S.P.Q.2d at 1749 (quoting *In re Oelrich*, 666 F.2d 578, 581, 212 U.S.P.Q. 323, 326 (C.C.P.A.1981)).

*In re Robertson*, 169 F.3d 743, 745 (Fed. Cir.1999).

■ Furthermore, "inherent anticipation does not require that a person of ordinary skill in the art *at the time* would have recognized the inherent disclosure." *Schering Corp.*, 339 F.3d at 1377 (emphasis added) (citing *"e.g., In re Cruciferous*

*Sprout Litig.*, 301 F.3d 1343, 1351 (Fed. Cir.2002); *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1366 (Fed.Cir. 1999) ('Where . . . the result is a necessary consequence of what was deliberately intended, it is of no import that the article's authors did not appreciate the results.)'"). Moreover, it is not necessary that the inherent disclosure was recognized by a person having ordinary skill in the art *before the critical date of the patent* as long as the scope of the prior art includes disclosure of the inherent feature.[3] *Schering Corp.*, 339 F.3d at 1377–78 (citing *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268–69 (Fed.Cir.1991)). Because "inherency, like anticipation itself, requires a determination of the meaning of the prior art," the Court "may resolve factual questions about the subject matter in the prior art by examining the reference through the eyes of a person of ordinary skill in the art, among other sources of evidence about the meaning of the prior art." *Schering Corp.*, 339 F.3d at 1377.

### ii. Invalidity Based on Obviousness

■ A patent is invalid based on obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). While the obviousness inquiry is ultimately a legal determination, it is predicated on underlying factual findings that are unique to each patent case. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406–07, 127 S.Ct.

---

3. *See Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1349 (Fed.Cir.1999) ("Once it is recognized that interstitial and porous air were inherent elements of the prior art compositions, the assertion that air may act as a sole sensitizer amounts to no more than a claim to the discovery of an inherent property of the prior art, not the addition of a novel element. Insufficient prior understanding of the inherent properties of a known composition does not defeat a finding of anticipation.").

1727, 167 L.Ed.2d 705 (2007). However, "a district court can properly grant, as a matter of law, a motion for summary judgment on patent invalidity when the factual inquiries into obviousness present no genuine issue of material facts." *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1366 (Fed.Cir.2011) (quoting *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 716 (Fed.Cir.1991)); *accord Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984); *Chore-Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 778–79 (Fed.Cir.1983).

▆▆▆▆ Because a patent enjoys a statutory presumption of validity, 35 U.S.C. § 282, an alleged infringer seeking to establish that a patent is invalid as obvious must overcome the presumption of validity "by clear and convincing evidence," *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1320 (Fed.Cir.2011). Thus, to establish a prima facie case of obviousness, the burden is on the alleged infringer to establish, by clear and convincing evidence, that a skilled artisan would have both been motivated to combine the prior art and have a reasonable expectation of success in doing so. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed.Cir.2012).[4]

▆▆▆ The following four-factor test guides the obviousness inquiry: "(1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1237 (Fed.Cir. 2010) (citing *Graham v. John Deere Co.*,

383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)) (hereinafter "the *Graham* factors"). Indeed, the Federal Circuit has explained that courts are required to consider all four of the *Graham* factors prior to reaching a conclusion with respect to obviousness. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1076–77 (Fed. Cir.2012).

## C. Willful Infringement

The Federal Circuit established the current standard for willful infringement in *In re Seagate*, in which the Court "overrule[d] the standard set out in *Underwater Devices*" and, in so doing, "abandon[ed] the affirmative duty of due care." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed.Cir.2007). The Federal Circuit held "that proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness," which requires meeting a threshold objective standard and a subsequent subjective standard. *Id.* The threshold objective standard requires that, in order to establish willful infringement, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id.* "If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Id.*

Following *Seagate*, the Federal Circuit "established the rule that generally the

---

**4.** While it remains appropriate to analyze any "teaching, suggestion, or motivation to combine elements from different prior art references," the Supreme Court's opinion in *KSR* made clear that such considerations are not rigid requirements, and the "overall inquiry must be expansive and flexible." *Kinetic Concepts*, 688 F.3d at 1360.

'objective prong of *Seagate* tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement.'" *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 682 F.3d 1003, 1005–06 (Fed.Cir.2012) *cert. denied*, —— U.S. ——, 133 S.Ct. 932, 184 L.Ed.2d 752 (2013) (quoting *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed.Cir. 2010)).

## IV. DISCUSSION

### A. Invalidity of '492 Patent Family

■ The priority date of a patent functions as a cut-off date for what may qualify as a prior art reference. *See* 35 U.S.C. § 102. Where patents share a priority date, they are therefore subject to the same prior art references. Because the '492, '268, '711, and '381 patents share a common priority date, as members of the '492 patent family, they are subject to the same prior art references. It is for this reason that the Court will consider the '492, '268, '711, and '381 patents, and the prior art references asserted against them, together. However, it should be emphasized that the applicability of each prior art reference is still determined with regard to each claim individually.

As stated above, the party seeking summary judgment on the issue of patent invalidity "must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly & Co.*, 251 F.3d at 962. However, before addressing the questions of anticipation and obviousness, the necessary first step in considering patent validity or invalidity is to determine the proper meaning of the relevant disputed claim terms. *Akamai Techs., Inc.*, 344 F.3d at 1195 n. 4.

### i. Construction of Claim Terms

■ The Court resolved the construction of the majority of the disputed claim terms through the issuance of its *Markman* opinion on September 25, 2013. However, a new dispute has arisen over the course of the parties' submissions on Samsung's Motion for Summary Judgment.

■ VIS asserts that decompression of the video signal is a required limitation of all of its asserted claims. Pl. Virginia Innovation Sciences Inc.'s Mem. In Opp. to Def.'s Mot. for Summ. J. ("Mem. in Opp.") at 15, ECF No. 163. More specifically, VIS asserts that the conversion from a signal format appropriate for the mobile terminal to a display format for output to the alternative display inherently requires conversion from a compressed format, e.g. the signal format, to an uncompressed format, e.g. the display format. *Id.* at 16. Samsung argues this assertion by VIS constitutes an argument for a different claim construction than that already determined by the Court, in its *Markman* Opinion, for the term "converted video signal." Rebuttal Br. in Supp. of Samsung's Mot. for Summ. J. ("Rebuttal Br.") at 6–7, ECF No. 168. However, VIS's argument is based not on the term "converted video signal," but on the remaining language in the claims setting forth additional limitations beyond those included through the term "converted video signal" alone. Although conversion is the necessary process for obtaining the product, a "converted video signal," there is no rule which prevents a claim from including additional limitations beyond those set forth as the baseline in the Court's claim construction. In this case, the claim construction of the term "converted video signal" sets forth the minimum baseline regarding what must take place during the processing for the video signal to be considered "convert-

ed."[5] Thus, the inclusion of additional limiting language in the claims requiring the additional step of decompression beyond the baseline contemplated by the Court's construction of the term "converted video signal" would not require a change to the Court's construction of the term in its *Markman* Opinion. Moreover, while this issue might have been raised by the parties for resolution during claim construction, the Court has discretion to address it during consideration of a summary judgment motion. *See Stern v. SeQual Technologies, Inc.*, 840 F.Supp.2d 1260, 1266 (W.D.Wash.2012) *aff'd*, 493 Fed.Appx. 99 (Fed.Cir.2012); *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1292 (Fed.Cir.2005).

■ In support of their argument that conversion, as recited in the claims asserted, requires decompression, VIS cites to Figure 3 of the '492 specification, which shows receipt of a signal through a wireless network, processing by Video Compress Decoder, 304a, and transmission of the video signal to the display via an uncompressed format. Mem. in Opp. at 17, ECF No. 163. There is undoubtedly support in the '492 specification for an embodiment requiring processing of the video signal from a compressed format to an uncompressed format during conversion of the video signal, specifically Figure 3 and the associated description of that Figure at 5:44–6:47 of the '492 specification. Furthermore, "[w]hile it is true, of course, that 'the claims define the scope of the right to exclude' and that 'the claim construction inquiry, therefore, begins and ends in all

cases with the actual words of the claim,' *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed.Cir.1998), the written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed.Cir. 2001). However, the courts have repeatedly stated that "limitations from the specification are not to be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed.Cir. 1998) (citing *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir.1988)). The Federal Circuit has gone so far as to characterize "reading a limitation from the written description into the claims" as "one of the cardinal sins of patent law." *SciMed Life Sys., Inc.*, 242 F.3d at 1340 (citing *Comark Communic'ns, Inc.*, 156 F.3d at 1186). Thus, in construing the claims, the most important question for the Court to consider is whether decompression is a limitation encompassed by the language of the claims asserted by VIS, without reading limitations from the specification into the claims.

Language describing conversion of the video signal from a signal format to a display format appears in some form in the processing element of every independent claim relevant to VIS's asserted claims.[6] However, as the specific language used in the independent claims differs with regards to this element, each claim must be evaluated individually with regard to the asserted decompression limitation.

---

5. In its *Markman* Opinion, the Court gave the term "converted video signal" its plain and ordinary meaning, which is "a video signal that has been changed." *Markman* Opinion, 976 F.Supp.2d at 815 & 819, ECF No. 198.

6. All dependent claims asserted by VIS depend from an independent claim that is also

asserted with one exception. The claims of the '381 patent which are asserted by VIS are dependent claims which depend from independent claim 15 of the '381 patent, however, claim 15 is not itself asserted in these motions.

### 1. '492 Patent, Claim 23

The '492 patent's independent claim, claim 23, uses the following language with regard to the processing element:

"wherein processing by the signal conversion module includes converting the video signal from a compression format appropriate for the mobile terminal to a display format for the alternative display terminal that is different from the compression format, such that the converted video signal comprises a display format and a power level appropriate for driving the alternative display terminal."

'492 patent, 10:17–24. Specifically, the processing of the video signal in claim 23 must include "converting ... from a *compression format* ... to a display format ... that is *different from the compression format.*" *Id.* (emphasis added). In examining this claim language, it is clear that decompression is encompassed by the language of claim 23 and, thus, its dependent claims as well. It might be argued that a format different from the first compression format could simply constitute a different compression format, achievable through the performance of a process referred to as "transcoding" [7] by an encoder. However, the requirement that it be in a display format after conversion seems to indicate otherwise as evidence has been presented indicating that a video must be decompressed before it may be displayed. Mem. In Opp., Ex. A at ¶ 14, ECF. No. 163.

Specifically, the evidence before the Court indicates that a video in a display format must be uncompressed, and the Court finds this evidence compelling. Furthermore, the Court may examine relevant treatises addressing the art at issue. *NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282, 1293 (Fed.Cir.2005) (citing *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed.Cir.2005) (en banc)). At the time of filing of the '492 patent, the process of transcoding itself required decompression as a decoder would have to decode the compressed video before it can be re-coded in the different format.[8] "When decoding, codecs and decoders convert compressed video signals into raw, uncompressed video signals." Mem. in Opp., Ex. A–2 at ¶ 29, ECF No. 159; *see also* '492 patent at 6:6–29; Rebuttal Br. at 9, ECF No. 168. Thus, the claim language not only encompasses decompression but requires it as a limitation of claim 23 of the '492 patent. Additionally, while, as Samsung argues, the specification describes "compress decoders" (which by definition first decompress the signals) separately from "encoders" (which convert the signals to the format(s) and power level(s) required by the terminals to which they interface), there is no language in the specification to indicate that they are mutually exclusive functions of the processing element of the claims, i.e. "converting the video signal" or "processing by the signal conversion module." Since there is no lan-

7. *See* Mem. In Opp. Ex. A–2 at ¶ 29, ECF. No. 163 ("Some encoders can also 'transcode' or change one compressed video signal format into another compressed video signal format.").

8. *See,* Xin, Jun, Chia–Wen Lin, & Ming–Ting Sun, "Digital Video Transcoding," PROCEEDINGS OF THE IEEE, Vol. 93, No. 1, January 2005 at 85, <http://nthur.lib.nthu/edu.tw/bitstream/987654321/l/2030144010017.pdf> retrieved December 30, 2013 (A research paper on a proposed method of transcoding wherein it describes the prior art transcoding and the problem with it as follows: "[a] straightforward realization of a transcoder to cascade a decoder and an encoder: the decoder decodes the compressed video input and the encoder reencodes the decoded video into the target format. It is computationally very expensive. Therefore, reducing the complexity of the straightforward decoder-encoder implementation is a major driving force behind many research activities on transcoding.").

guage in the specification indicating mutual exclusivity of the "compress decoders" and the encoders, and since there is no requirement that decompression occur in a separate step from the conversion performed by the encoders, the proposition that decompression must occur in the conversion process finds support in the specification.

### 2. '711 Patent, Claim 15

The '711 patent's independent claim, claim 15, uses the following language with regard to the processing element:

> "wherein processing by the signal conversion hardware component includes converting the video signal from a compression format appropriate for the mobile terminal to a display format for the alternative display terminal that is different from the compression format, such that the converted video signal comprises the display format for the alternative display terminal."

'711 patent, 9:45–10:6. As this uses the same key language already discussed above with regard to claim 23 of the '492 patent, the same analysis applies here. Thus, decompression is a limitation of the conversion element required by the language in claim 15 of the '711 patent, as well as its dependent claims.

### 3. '268 Patent, Claim 21

The '268 patent's independent claim, claim 21, uses the following language with regard to the processing element:

> "wherein the processing includes converting a signal format appropriate for the mobile terminal to a display format for the alternative display terminal that is different from the signal format, the display format being a high definition digital format, such that the converted video signal produced by the processing unit comprises the high definition digital

format for output to the alternative display terminal."

'268 patent, 10:18–25. Unlike the language discussed above with regard to claim 23 of the '492 patent and claim 15 of the '711 patent, claim 21 of the '268 patent makes no direct reference to a compression format. Thus, decompression is only an element of the conversion in this claim if "a signal format appropriate for the mobile terminal" would inherently be a compressed format, and "a high definition digital format" would inherently be an uncompressed format. Both parties agree that, given the bandwidth limitations of a cellular network, the "signal format appropriate for the mobile terminal" of the video signal which was "sent from the wireless network communication" would be a compressed format. Mem. in Supp. of Samsung's Mot. for Summ. J. ("Mem. in Supp.") at 15, ECF No. 144 (undisputed fact 60, which VIS does not dispute); Memo in Opp. at 17, ECF No. 163.

VIS presents the declaration of their expert, Arthur T. Brody, as evidence in support of the inference that the "high definition digital format" must be uncompressed. However, the declaration of Mr. Brody only refers to what would be required for the video signal output described in the Palin reference to be displayed on a television. *See* Memo in Opp., Ex. A at ¶ 14, ECF No 159. Additionally, with respect to data transmissions generally, Mr. Brody's expert report states the increased data requirements for transmission of high definition signals and describes the corresponding need for those signals to be compressed in order to be transmitted at the rate of Megabit-per-second rather than Gigabit-per-second. Mem. in Opp., Ex. A–2 at ¶ 28, ECF. No. 163. Furthermore, Mr. Brody's declaration suggests that decompression of a signal can take place after it has

been transmitted to an alternative display terminal such as a television. Mem. in Opp., Ex. A at ¶ 14, ECF No. 163. Therefore, if a high definition signal can be, and preferably is, transmitted in a compressed format and the compressed signal can be decompressed for display at the alternative display terminal, decompression is not necessary prior to transmission to the alternative display terminal. VIS's evidence thus argues against their assertion of decompression as a required limitation of the conversion element of this claim.

The Court notes that claim construction is a matter of law, and even if VIS's arguments presented an issue of fact, it would not prevent the Court from rendering a decision on the meaning of the claim language. *Markman,* 52 F.3d at 979. Here, the claim language and specification, as well as the evidence presented as to what a person having ordinary skill in the art would have understood from the specification and claim language, support the finding that decompression is not a limitation *required* by the language of claim 21 of the '268 patent.

#### 4. '381 Patent, Claims 19 and 33

The '381 patent's independent claims, claims 19 and 33, use the following language with regard to the processing element:

> "wherein the processing ... includes converting a signal format appropriate for the mobile terminal to a different format for output to the alternative display terminal, such that the converted video signal produced by the conversion device comprises a high definition television (HDTV) digital signal for output to the alternative display terminal."

'381 patent, 9:49–56 & 10:52–48. The only difference between the language used in claims 19 and 33 of the '381 patent and claim 21 of the '268 patent is that the '381 patent's claims use the term "high definition television (HDTV) digital signal" in place of "high definition digital signal." The insertion of the word "television" does not change the fact that while it may be transmitted as either a compressed or uncompressed signal, the increased data involved in a high definition video signal of any kind makes transmission as a compressed signal easier than transmission as an uncompressed signal. Mem. in Opp., Ex. A–2 at ¶ 28, ECF. No. 163. Therefore, the same analysis as used with respect to the '268 patent's language applies. Furthermore, as there are no other differences in claim language between claims 19 and 33 of the '381 patent and claim 21 of the '268 patent, the analysis of the '268 patent's claim applies to the '381 patent's claims in its entirety. Thus, decompression is not a *required* element of the '381 patent's claim 19, claim 33, or their dependent claims.

In summary, decompression is a limitation required by the claim language of only the '492 and '711 patents' asserted claims. While the language covering the conversion element in the asserted claims of the '268 and '381 patents might, under a liberal interpretation, encompass decompression, it is not a required element of the conversion step. As such, in considering the validity or invalidity of the asserted claims of the '268 and '381 patents, decompression during conversion of the video signal is not a limitation which must be disclosed in the prior art in order to render the asserted claims of the '268 and '381 patents invalid as anticipated or obvious.

#### ii. Anticipation

Samsung asserts that U.S. Patent No. 7,580,005 ("Palin") addressed the same "problem" identified by VIS's '492 patent family and the same "solution" to that problem well before the priority date of

the '492 patent family. Mem. in Supp. at 17, ECF No. 144. Samsung asserts that Palin thus anticipates the '492 patent family and renders the '492, '711, '268, and '381 patents invalid. *Id.*

"A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp.*, 339 F.3d at 1377. VIS argues in their brief in opposition that Palin fails to anticipate the asserted claims of the '492 patent family because Palin does not disclose the conversion element or the decompression step of conversion required by all the asserted claims. Mem. in Opp. at 15–16, ECF No. 163. Under the claim constructions stated above however, decompression is only required by the asserted claims of the '492 and '711 patents, not by the asserted claims of the '268 and '381 patents.

VIS further argues with respect to the asserted dependent claims that Palin fails to disclose the external power source limitation of some of those claims (the '492 patent's claim 26, the '711 patent's claim 18, and the '381 patent's claim 22), and that Palin fails to disclose HDMI as required by other dependent claims (the '268 patent's claim 27 and all asserted claims of the '381 patent). The Court will address those disputed issues in the following order; Palin's disclosure of conversion of the video signal and failure to disclose decompression of the video signal during conversion, Palin's failure to disclose an external power source, and Palin's failure to disclose HDMI.

### 1. Palin's Disclosure of Conversion and Failure to Disclose Decompression

■ VIS asserts that Palin fails to disclose decompression or conversion of the video signal as Palin describes a file transfer system. Mem. in Opp. at 18, ECF No. 163. Both parties agree that the mobile device in Palin receives a compressed video signal. *Id.;* Rebuttal Br. at 7, ECF No. 168. However, VIS asserts that Palin is directed to splitting data packets, wherein the received compressed file is split into portions, of which one of those portions is sent on to a television without any modification of the original compressed file.

Samsung argues in rebuttal that, other than the opinion of its expert, Mr. Brody, VIS fails to provide support for its argument that the "high quality graphics signal" described in Palin must be a compressed video signal. However, it is noted that, while VIS does rely on the opinion of its expert to support this assertion, the burden remains on Samsung to prove the invalidity of the asserted claims by clear and convincing evidence. *i4i Ltd. P'ship*, 131 S.Ct. at 2246.

The conversion element of the asserted claims requires at a minimum "only a change to the video signal identified at the beginning of the claim." *Markman* Opinion, 976 F.Supp.2d at 814–15, ECF No. 196. In construing the term "converted video signal" in its *Markman* Opinion, the Court determined that the conversion of the video signal did not require a change to the underlying video content. *Markman* Opinion, 976 F.Supp.2d at 813–15. In reviewing Palin, it is clear that Palin teaches the splitting of the received video signal data packets into two categories—data for display on the first display, the mobile terminal, and data for display on the second display, the television. Palin also teaches teaching reformatting of the data to be displayed on the second display. Declaration of Dr. Kevin C. Almeroth ("Almeroth Dec."), Ex. Q at Abstract, ECF No. 136. However, because a "converted video signal" as construed by this Court in its *Markman* Opinion does not require a change to the underlying video content,

the fact that Palin's processing step does not change the *content* of the video signal is irrelevant to the issue of whether it teaches the claimed conversion process to produce a "converted video signal."

The '492 patent family's independent claims all require a conversion of the video signal to produce a "converted video signal." In all the asserted claims, this requires a conversion from a "format appropriate for the mobile terminal" to a "format [for/for output to] the alternative terminal," which is different from the original "format appropriate for the mobile terminal." '492 patent, 10:17–24; '711 patent, 9:45–10:6; '268 patent, 10:18–25; '381 patent, 9:49–56 & 10:52–48. Palin receives a video signal in a compressed format as data packet(s), which format is appropriate for the mobile terminal. Almeroth Dec, Ex. Q at 2:25–29 & 2:37–38, ECF No. 136. That the data received in Palin is in a format appropriate for the mobile terminal is further evidenced by the mobile terminal's ability to process and/or display the received data packets. *Id.* at 2:54–57 & 3:3–13.

Palin also discloses that the converted video signal be formatted for the second, or alternative, display terminal. *Id.* at 2:39–41 ("the image on the second display device is viewed as taking into consideration the different display capabilities of the second display device."). Thus, Palin discloses the limitations that the converted video signal comprises the format, display and power level, *for* the alternative display terminal. Palin further discloses a display format for output *to* the alternative display terminal. *Id.* at 2:54–57 ("The image data received by the mobile terminal comprises data to be ultimately reassembled into an image to be displayed on a display . . . on another device."). Therefore, Palin discloses conversion of a video signal from a format appropriate for the mobile terminal

to a format appropriate for the alternative display terminal, including display format and power levels. As this is the only dispute as to whether Palin discloses or teaches the limitations of claims 21, 22, 25, 28, or 29 of the '268 patent, those claims are invalid as anticipated by Palin. Therefore, the Court grants summary judgment as to the invalidity of claims 21, 22, 25, 28, or 29 of the '268 patent.

However, with regard to the '492 and '711 patents' conversion element, the Court has already stated that it includes the additional limitation of decompression. Because the conversion element as recited in the asserted claims takes place at the mobile terminal, the decompression of the video signal as a required limitation of the conversion of the video signal must similarly take place at the mobile terminal. Thus, in order to anticipate every limitation of the asserted claims of the '492 and '711 patents, Palin must also disclose decompression of the video signal at the mobile terminal.

VIS asserts that Palin fails to discuss compression or display formats and that the Bluetooth connection used in Palin to transmit data to the television would be incapable of supporting the transmission of uncompressed video. Mem. in Opp. at 19, ECF No. 163. VIS further asserts that Samsung has previously conceded, in one of Samsung's own prior patent applications, that Bluetooth was not a suitable technology for relaying video. *Id.* In rebuttal, Samsung argues that VIS' assertion regarding the inability to use a Bluetooth connection to output a video signal in display format is belied by the '492 specification, which discloses the use of a Bluetooth connection for that purpose. Rebuttal Br. at 7, ECF No. 168. The '492 specification lists a Bluetooth connection as a possible method of transmitting the video signal. '492 patent at 4:11–16

(where specification states that "[a] wireless connection [between the external display and the mobile terminal] may also be provided, although it may currently be less practical to provide than the wired connection because of the potential for high throughput rate requirements" and that wireless connection "may also implement any conventional known technology including but not limited to a Bluetooth connection."). However, as already discussed above, decompression is not an inherently necessary step in the conversion element in all the asserted claims, let alone all the embodiments described in the '492 specification. Furthermore, VIS has rebutted Samsung's argument with evidence that, due to the constraints of the bandwidth available through a Bluetooth connection, it would not be feasible to transmit an uncompressed video signal via a Bluetooth connection. Mem. in Opp., Ex. A at ¶ 12–13, ECF No. 159.

While Palin makes no reference to compression explicitly, Palin may still anticipate the claims if decompression is "inherent" in its disclosure. *In re Robertson*, 169 F.3d at 745. Furthermore, "inherent anticipation does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure." *Schering Corp.*, 339 F.3d at 1377. The Court concludes that Palin does inherently contemplate decompression as a step in its process as the video must ultimately return to an uncompressed format in order to be displayed on the second display terminal. Mem. in Opp., Ex. A at ¶ 14, ECF No. 159. However due to the constraints of Bluetooth connections as already discussed, that decompression must take place after the video is transmitted in a compressed format via a Bluetooth connection to the television. In the asserted claims of the '492 and '711 patents, however, the decompression occurs during conversion at the mobile terminal, prior to

transmission of the video signal to the alternative display terminal. Thus, while Palin does inherently disclose decompression, it does not disclose decompression as an element of the conversion of the video signal at the mobile terminal.

The Court concludes that Palin does not teach decompression at the mobile terminal prior to sending the signal to the television, as is required by the asserted claims of the '492 and '711 patents. As this is the only claim element of the asserted independent claims not disclosed by Palin, we will return to address this limitation in the obviousness analysis to determine if, as Samsung asserts, Palin in combination with other prior art renders decompression obvious.

### 2. Palin's Failure to Disclose an External Power Source

VIS asserts that Palin fails to anticipate the '492 patent's claim 26, the '711 patent's claim 18, and the '381 patent's claim 22, because Palin fails to disclose the use of an external power source to support the video signal conversion. Mem. in Opp. at 19–20, ECF No. 163. Samsung asserts that even if Palin does not disclose an external power source it was obvious that an external power source could be used as of the July 17, 2004 priority date because every mobile terminal's battery is charged by plugging the mobile terminal into an external power source. Rebuttal Br. at 10–11, ECF No. 168. However, VIS argues that plugging a mobile terminal into an external power source as Samsung describes results in charging the battery, and any power used by the mobile terminal would first flow through the battery, the internal power source. Mem. In Opp. at 20–21, ECF No. 163.

The language used in these dependent claims with regard to the external power source limitation is identical. The lan-

guage of claim 22 contemplates an external power source separate from the recharging process in a mobile terminal because claim 22 states that the power used is from a "source that differs from the internal power supply of the mobile terminal." '381 patent at 9:66–10:4. These dependent claims teach that the conversion module receives power for the conversion from an external power source, which is separate from the internal power source—i.e. the battery.

The charging of a mobile terminal's battery involves the provision of power from an external power source to the internal power source. Such method of recharging does not teach obtaining power from a source separate from the internal power source as required by the language of the claims. Thus, the Court finds VIS'S argument persuasive and summary judgment is denied as to claim 26 of the '492 patent, claim 18 of the '711 patent, and claim 22 of the '381 patent.

### 3. Palin's Failure to Disclose HDMI

VIS asserts that Palin fails to anticipate claim 27 of the '268 patent and the asserted claims 19–33 of the '381 patent, because Palin fails to disclose HDMI as a method of transmitting the converted video signal to the alternative display terminal. Samsung asserts that even if Palin doesn't disclose HDMI as a method of transmitting the converted video signal, using HDMI would have been obvious as of the July 17, 2004 priority date for the '268 and '381 patents, and that a person having skill in the art would have known about HDMI and been motivated to combine HDMI with Palin.

VIS does not dispute that a person having skill in the art would know about HDMI as of the priority date. However, VIS argues that a person having ordinary skill in the art would have no motivation to combine Palin with HDMI because Palin

teaches sending a compressed signal and HDMI is an uncompressed format.

HDMI is a method by which a video signal in an uncompressed format can be transmitted between devices via a wireline between the first and second devices. Almeroth Dec. at ¶ 34, ECF No. 136; Mem. in Opp., Ex. A–2 at ¶ 37–38, ECF No. 159. Palin is directed to the transmission of a video signal from a mobile terminal to a second display terminal. VIS argues that Palin teaches sending a compressed signal, because the method of transmission disclosed in Palin is a Bluetooth connection, which is incapable of supporting the transmission of uncompressed video. Mem. in Opp. at 18 & Ex. A at ¶ 9–14, ECF No. 159. Thus, the substitution of HDMI in place of Bluetooth in Palin would then imply a switch from the transmission of compressed video signals to the transmission of uncompressed video signals. This switch would require decompression of the original video signal received by the mobile terminal to take place at the mobile terminal in order to facilitate transmission of an uncompressed video signal via HDMI from the mobile terminal to the second display terminal. Thus, the combination would require a reworking of the system taught by Palin. Nevertheless, both HDMI and Palin are directed to facilitating the transmission of video signals between devices.

VIS also argues that due to the size requirements for HDMI and the size limitations of mobile terminals, especially as of the priority date, it would not have been obvious to combine Palin with HDMI. Thus, in order for the combination of Palin and HDMI to have been obvious, a person having ordinary skill in the art would have to have been motivated to combine a system which transmits a compressed video signal with a method for transmitting an uncompressed video signal—thereby ne-

cessitating incorporation of decompression of the video signal into the processing of the video signal—as well as to combine the fairly bulky output port required for HDMI with a relatively small electronic device. The Court concludes that whether the combination of Palin and HDMI would have been obvious to a person having ordinary skill in the art is a close call. Due to the standard at summary judgment, which requires that the evidence be viewed in favor of the nonmovant, VIS, and the clear and convincing evidence of invalidity burden of proof borne by Samsung, summary judgment is denied on this limitation. Samsung has failed to meet its burden of proof and as such, the Court denies summary judgment of invalidity with regard to claim 27 of the '268 patent and all the asserted claims of the '381 patent.

### iii. Obviousness

In addition to asserting anticipation of the '492, '268, '711, and '381 patents through the Palin reference, Samsung alternatively asserts that the Digital Living Network Alliance's publication "Home Networked Device Interoperability Guidelinesv1.0," (hereinafter "DLNAv1.0"), in combination with Palin, renders obvious any claims not already anticipated by Palin alone. Mem. in Supp., 26, ECF No. 144. Samsung additionally included U.S. Patent No. 8,028,093 ("Karaoguz") in the combination of references rendering the '492 patent family obvious. However, Karaoguz was included to support Samsung's argument of invalidity should the Court adopt in its *Markman* Opinion Samsung's proposed construction of the term "converted video signal".[9] *Id.* Thus, as the Court did not adopt Samsung's proposed construction, the parties' arguments regarding Ka-

raoguz are no longer relevant and the Court will not address them.

To establish a prima facie case of obviousness, the burden is on the alleged infringer to establish, by clear and convincing evidence, that a skilled artisan would have both been motivated to combine the prior art and have a reasonable expectation of success in doing so. *Kinetic Concepts, Inc.,* 688 F.3d at 1360. The *Graham* factors which, as discussed above, inform the obviousness analysis are as follows: "(1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others." *Wyers v. Master Lock Co.,* 616 F.3d at 1237 (citing *Graham,* 383 U.S. at 17–18, 86 S.Ct. 684). As the Court must consider all four of the *Graham* factors in its obviousness analysis, *In re Cyclobenzaprine,* 676 F.3d at 1076–77, the Court will structure its analysis accordingly. "The determination of invalidity for reasons of obviousness under 35 U.S.C. § 103 is a legal conclusion based on underlying facts" with the *Graham* factors being "factual considerations that underlie the obviousness inquiry." *Galderma Laboratories v. Tolmar,* 737 F.3d 731, 736 (Fed.Cir.2013) (citing *Graham,* 383 U.S. at 17–18, 86 S.Ct. 684). At summary judgment, therefore, a determination regarding obviousness may only lie if there are no genuine disputes of material fact with regard to the *Graham* factors. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

 The third *Graham* factor is uncontested and the experts for each party appear to have come to an agreement regarding the level of ordinary skill in the

---

**9.** The construction of "converted video signal" proposed by Samsung was "a video signal where the underlying video content has

been changed to be appropriate for display on the alternative display." *Markman* Opinion, 976 F.Supp.2d at 813, ECF No. 198.

art. Consideration of the second *Graham* factor suggests that, should DLNAv1.0 be valid as a prior art reference to the '492 and '711 patents, the prior art would likely render at least the asserted independent claims of those patents obvious. Furthermore, based on the evidence currently presented, the fourth *Graham* factor, secondary considerations, would not likely succeed in rebutting the prima facie case of obviousness should DLNAv1.0 be valid prior art. As discussed below, however, consideration of the first *Graham* factor reveals that there are genuine disputes of material fact as to DLNAv1.0's status as prior art to the '492 patent family. These genuine disputes of material fact are sufficient to preclude the Court from finding that Samsung has demonstrated a prima facie case of obviousness.

### 1. The First *Graham* Factor

The first *Graham* factor involves the scope and content of the prior art. Here, the parties dispute both whether DLNAv1.0 qualifies as prior art and what is taught by DLNAv1.0. The first issue the Court must address therefore is whether DLNAv1.0 qualifies as a printed publication within the meaning of 35 U.S.C. § 102.

"Printed publications" have been classified as prior art references which can invalidate a patent under 35 U.S.C. § 102(a) and (b). The courts have interpreted the statutory phrase "printed publication" consistently within § 102 with the only difference between sections (a) and (b) being the timing of the publication. *See, Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.,* 291 F.3d 1317, 1324 (Fed.Cir. 2002); *Application of Foster,* 52 C.C.P.A. 1808, 343 F.2d 980, 986 (1965) ("[W]hen a reference fully discloses in every detail the subject matter of a claim, the statutory basis of a rejection on that reference is 35

U.S.C. § 102(a) if the reference date is before the applicant's date of invention, thereby establishing want of novelty, and section 102(b) if the reference date is more than one year prior to the actual United States filing date, thereby establishing a so-called 'statutory bar,' more accurately, a one-year time-bar which results in loss of right to a patent, regardless of when the invention was made.").

■■■ "The statutory phrase 'printed publication' has been interpreted to mean that before the critical date the reference must have been sufficiently accessible to the public interested in the art; dissemination and public accessibility are the keys to the legal determination whether a prior art reference was 'published.' " *In re Klopfenstein,* 380 F.3d 1345, 1348 (Fed.Cir. 2004) (quoting *In re Cronyn,* 890 F.2d 1158, 1160 (Fed.Cir.1989)). "A document is publicly accessible if it 'has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.' " *Cordis Corp. v. Boston Scientific Corp.,* 561 F.3d 1319, 1333 (Fed.Cir.2009) (quoting *In re Wyer,* 655 F.2d 221, 226 (CCPA 1981)). In its analysis of the case law concerning printed publications as prior art references within the meaning of 35 U.S.C. § 102, the Federal Circuit has stated that:

throughout our case law, public accessibility has been the criterion by which a prior art reference will be judged for the purposes of § 102(b). Oftentimes courts have found it helpful to rely on distribution and indexing as proxies for public accessibility. But when they have done so, it has not been to the exclusion of all other measures of public accessibility.

*In re Klopfenstein,* 380 F.3d at 1350. "The determination of whether a reference is a 'printed publication' under 35 U.S.C. § 102(b) involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein,* 380 F.3d at 1350 (citing *In re Cronyn,* 890 F.2d at 1161 and *In re Hall,* 781 F.2d 897, 899 (Fed.Cir.1986)).

Due to the presumption of validity of an issued patent, the burden of proof remains with Samsung to show by clear and convincing evidence that DLNAv1.0 is a valid prior art reference which functions to invalidate the patent. *i4i Ltd. P'ship,* 131 S.Ct. at 2246. Samsung has offered evidence showing that DLNAv1.0 was published June 22, 2004, before the '492 patent family's priority date of July 16, 2004. Mem. in Supp. at 26, ECF No. 144; Berliner Declaration, Ex. V at 69:5–70:25 & 152:13–155:16, ECF No. 146. Samsung has offered the sworn testimony of DLNA's Marketing Manager, Katherine Gengler, showing that, at the very least, DLNAv1.0 was available to members of the publishing organization as of June 22, 2004. Berliner Declaration, Ex. V at 70:11–25, ECF No. 146. VIS has presented evidence that the cost of membership in DLNA was a $10,000 fee as of July 19, 2013, the date of Ms. Gengler's deposition. Mem. in Opp., Ex. D–3 at 104:18–23, ECF No. 159. These facts are undisputed by VIS and Samsung.

Notwithstanding this information, Samsung has offered no evidence showing how or at what price DLNAv1.0 would have been available to non-members of the interested public. The sworn testimony of DLNA's Marketing Manager, Katherine Gengler, states merely that posting a document on an external website and making it available for sale was DLNA's common method of publication. Berliner Declara-tion, Ex. V at 70:11–17, ECF No. 146. Furthermore, she does not know what price DLNAv1.0 would have been sold at, had it been posted for sale via the website. *Id.*

Samsung appears to argue, in the alternate, that DLNA's membership consists of a significant portion of the interested public, and, as such, that DLNAv1.0 was sufficiently accessible to the *interested* public. *See Cooper Cameron Corp.,* 291 F.3d at 1324 ("on remand the district court should take into consideration that reports need only be accessible to the interested public, *Mass. Inst. of Tech. v. AB Fortia,* 774 F.2d 1104, 1109, 227 U.S.P.Q. 428, 432 (Fed.Cir. 1985), which in this case may be the very entities who had access to the documents: SISL joint venture members, participants, and their contractors and licensees."). However, in *Cooper Cameron Corp.* there was evidence that the information was not maintained in a state of confidentiality and much of the information was available without restriction—issues which the district court in that case was instructed to consider on remand. *Id.; see also, Kyocera Wireless Corp. v. Int'l Trade Comm'n,* 545 F.3d 1340, 1351 (Fed.Cir.2008) (where the court found the documents, which "were visible to any member of the interested public without requesting them from an ETSI member," to be publicly available, especially as "ETSI did not impose restrictions on ETSI members to prevent them from disseminating information about the standard to non-members.").

Here, VIS has put forward evidence that distribution of this document, DLNAv1.0, was restricted and that it was known that non-public documents on DLNA's "Kavi website" could only be shared among member companies. Almeroth Dec, Ex. R, DLNAv1.0, at 1, ECF No. 145 ("Do Not Copy" "Copyright 2004 ... Any form of reproduction and/or distribution of these

works is strictly prohibited."); Mem. in Opp., Ex. D–3, Deposition of Katherine Gengler, at 142:3–143:7, ECF No. 159. Samsung argues that a marking of "confidential" on a document has no effect on public accessibility where distribution of the documents to the interested public occurred or was intended. However, Samsung merely presents evidence that DLNA *intended* for the DLNAv1.0 guidelines to be adopted by the industry and fails to provide evidence of *distribution* outside the members of the publishing organization.

■ Samsung additionally asserts that the press releases regarding DLNAv1.0 show that interested persons would have been aware of the availability of DLNAv1.0. Rebuttal Br. at 12, ECF No. 168. However, the standard for a printed publication is not public awareness of a document, but public *accessibility* of the document. *In re Klopfenstein*, 380 F.3d at 1348. Furthermore, Samsung's contention, that VIS has failed to produce evidence that access was denied to any who sought it, fails as it is Samsung, and not VIS, who bears the burden of proof in this instance.

■ Public accessibility is present where a document is " 'made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.' " *Cordis Corp.*, 561

F.3d at 1333 (quoting *In re Wyer*, 655 F.2d at 226). Availability only at the cost of a $10,000 membership fee is likely to render the document effectively inaccessible to the general members of the interested public.[10] Furthermore, genuine issues of material fact remain as to whether the document, DLNAv1.0, was available to non-members and, if it was available, at what price it would have been accessible.

Due to the genuine issues of material fact regarding accessibility, summary judgment is not available on the issue of whether DLNAv1.0 qualifies as a printed publication under 35 U.S.C. § 102(a). *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The factual dispute regarding the price one could pay to obtain access to DLNAv1.0, as well as the subsequent determination of whether that price would effectively render the document insufficiently accessible to the pertinent public, are issues for the finder of fact. However, it is clear that the only price point presented by the parties—$10,000 as of July 17, 2013—is too high to consider the document accessible to the interested public. This is particularly so when one considers that Samsung bears the burden of proving invalidity by "clear and convincing" evidence.

Having determined that there are genuine issues of material fact which prevent the Court from determining at the summary judgment stage whether DLNAv1.0 is a valid prior art reference to the '492 patent family, the Court cannot grant summary judgment based on the other three

---

**10.** As the parties' experts agree on the level of ordinary skill in the art, the Court is using that definition to determine who would constitute members of the interested public. The parties' experts agree that those possessing "an accredited bachelor's degree in computer science, electrical engineering, or a related discipline that included coverage of video technologies and familiarity with wireless communications, and also at least two years of industry experience" would meet the level of ordinary skill in the art. Almeroth Dec., at ¶ 30, ECF No. 136; Mem. in Opp., Ex. A at ¶ 2, ECF No. 159. The experts also agree that industry experience could substitute for formal education and Dr. Almeroth puts forth the idea that additional graduate experience could substitute for industry experience. *Id.*

factors. However, because the Court is required to consider all four of the *Graham* factors in its obviousness analysis, *In re Cyclobenzaprine*, 676 F.3d at 1076–77, in order to provide a complete analysis to the parties and any appellate court, the Court will briefly address the other three *Graham* factors.

## 2. The Second *Graham* Factor

The second *Graham* factor involves the comparison of the differences between the prior art and the claims at issue to determine if the prior art would be capable of rendering the claims at issue obvious. As the Court has already concluded above that Palin teaches all the limitations required by the asserted claims of the '492 and '711 patents except decompression at the mobile terminal prior to sending the signal to the television, the Court will here address whether DLNAv1.0 would cure Palin's deficiency and render the asserted claims of the '492 and '711 patents obvious.

DLNAv1.0 defines a set of mandatory and optional media format profiles to enable electronic devices to send and receive media content between them so that the media content can be enjoyed on all the devices. Mem. in Supp., Ex. R at DLNA_SAM003715–16. DLNAv1.0 incorporates MPEG–4, a video compression format using the MPEG codec, into the mandatory media format support requirements set forth by DLNAv1.0 Table 7–4. *Id.* at DLNA_SAM00003785–86. In doing so, DLNAv1.0 states that "by default support MPEG–4 encoding of captured video content, but either convert to a mandatory DLNA AV media format profile to on-demand streamlining to DLNA devices or

else allow the user to change the content capture encoding to a mandatory DLNA AV media format profile." [11] *Id.* at DLNA_SAM003786. This language suggests that in supporting the MPEG codec's form of encoding, the media format support requirements mandate that the device be capable of decoding the media, i.e. decompressing it, and then re-encoding it. In combination with Palin, which discloses the other elements of the independent claims of the '492 and '711 patent, the provision by DLNAv1.0 of a mandatory media format support requirement for the device, which would require decompression of the video signal as part of re-encoding it to a mandatory DLNA AV format prior to sending it to the home devices, would cover the scope of the claims in their entirety. The Court observes, without deciding, that, should DLNAv1.0 be a valid printed publication within the meaning of 35 U.S.C. § 102, the jury is likely to conclude that the combination of DLNAv1.0 and Palin appears to render the asserted independent claims of the '492 and '711 patents obvious.

Additionally, regarding the motive to combine DLNAv1.0 with Palin, the fact that Palin taught provision of video from a mobile terminal to a television would give a person having skill in the art incentive to look for an industry standard for the formatting of the video and media format support requirements for transmission of media content, specifically video, between devices. As DLNAv1.0 was developed by many of the major companies in those areas of technology, mobile terminals and televisions, a person having ordinary skill in the art would likely have been motivated

---

11. The Court interprets the above quote to mean the following: the media format support requirements require DLNA supported devices to, by default, support MPEG–4 encoding of captured video content and in so doing either convert it to a mandatory DLNA AV media format profile with on-demand stream-lining to DLNA devices or allow the user to change the MPEG–4 encoding to a mandatory DLNA AV media format profile.

to use the standards proposed by those companies.

### 3. The Third *Graham* Factor

The third *Graham* factor, the level of ordinary skill in the art, is largely uncontested among the parties. The expert for Samsung, Dr. Kevin Almeroth, in his report, purports to adopt the level of ordinary skill in the art proposed by VIS's expert, Arthur T. Brody, in his report. The parties' experts agree that those possessing "an accredited bachelor's degree in computer science, electrical engineering, or a related discipline that included coverage of video technologies and familiarity with wireless communications, and also at least two years of industry experience" would meet the level of ordinary skill in the art. Almeroth Dec. at ¶ 30, ECF No. 136; Mem. in Opp., Ex. A at ¶ 2, ECF No. 159. The experts also agree that industry experience could substitute for formal education or specific academic training. *Id.* As those elements of the definition of the level of ordinary skill in the art listed above appear to be agreed upon by the parties, the Court will adopt them for the purposes of this opinion.

Dr. Almeroth additionally puts forth the proposition that additional graduate experience could substitute for the two years of industry experience. Almeroth Dec. at ¶ 30, ECF No. 136. As VIS does not contest this suggestion and it mirrors the agreed upon substitution of experience for education, the Court will also adopt that proposition into the definition of the level of ordinary skill in the art for the purposes of this opinion.

### 4. The Fourth *Graham* Factor

"In *Graham* the Supreme Court explained that the public and commercial response to an invention is a factor to be considered in determining obviousness, and is entitled to fair weight." *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.,* 119 F.3d 953, 957 (Fed.Cir.1997). (citing *Graham,* 383 U.S. at 35–36, 86 S.Ct. 684). "The so-called 'secondary considerations' provide evidence of how the patented device is viewed by the interested public: not the inventor, but persons concerned with the product in the objective arena of the marketplace." *Id.* "This objective evidence of nonobviousness includes copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention." *In re Rouffet,* 149 F.3d 1350, 1355 (Fed.Cir. 1998) (internal citations omitted).

VIS presents evidence on the secondary considerations of commercial success, copying, and long-felt need and asserts that these secondary indicia of nonobviousness outweigh any obviousness claim. Mem. in Opp. at 31, ECF No. 163. The evidence presented by VIS in support of these asserted secondary considerations are the commercial success of Samsung's accused products, which it alleges were copied from VIS's patents, and Samsung's efforts to solve the problem addressed by the patents-in-suit. *Id.* at 31–33. Samsung argues that these secondary considerations are inadequate because of VIS' failure to establish a nexus between the indicia and a purportedly nonobvious feature of VIS' invention. Rebuttal Br. at 21, ECF No. 168.

### a. Commercial Success

A nexus must exist between the commercial success and the claimed invention in order for the evidence of commercial success to be relevant or significant to the obviousness analysis. *Tokai Corp.,* 632 F.3d at 1369 (citing *Ormco Corp. v. Align Tech., Inc.,* 463 F.3d 1299, 1311–12 (Fed.

Cir.2006)). "If commercial success is due to an element in the prior art, no nexus exists." *Id.* VIS has proffered no evidence showing a nexus between the commercial success of the accused products and the nonobvious invention contained in their patents. VIS instead cites to *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed.Cir. 2000), for the presumption that: "if the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus." Mem. in Opp. at 30–31, ECF No. 163.

 Samsung seeks to rebut this presumption by arguing that the nexus cannot be presumed as VIS has failed to show that "the marketed product . . . is coextensive with [the claimed features]." Rebuttal Br. at 23, ECF No. 168 (citing to *Brown & Williamson Tobacco Corp.*, 229 F.3d at 1130). In order to show commercial success, it is not enough for VIS to show evidence that the accused products have been successful and that the accused products include the claimed invention.[12] "When the thing that is commercially successful is not coextensive with the patented invention—for example, *if the patented invention is only a component of a commercially successful machine* or process—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold." *Demaco Corp.*, 851 F.2d at 1392 (emphasis added). VIS attempts to do so by produc-

ing internal documents from Samsung in which roughly one quarter of Samsung consumers in 2012 connected their tablets or smartphones to their televisions more than twice a week. Mem. in Opp. at 32, Ex. 5 at SAMV0031528, Ex. 6 at SAMV00408793, ECF No. 163. At summary judgment, viewing the evidence in a light most favorable to VIS, this is sufficient to show a nexus between the commercial success of the accused products and the claimed invention.

#### b. Long-felt Need

The evidence presented by VIS, showing that the '492 patent has been referenced by several other patent applications and that Samsung filed an application describing the same need eight months after VIS's initial filing, fails to show long felt need. The numerous citations to the '492 patent as a reference in other patent applications only shows that the field is advancing and there is work being done that is related to the '492 patent. The patent application filed by Samsung describing the same problem was only filed eight months after VIS' initial filing, which is hardly a period of time in which the need can be considered to have become "long felt." Moreover, a filing eight months *after* the filing of the '492 patent fails to show that the '492 patent filled a need that existed *prior* to the filing of the '492 patent.

#### c. Copying

 Regarding VIS' assertion of copying, copying is only a secondary indicia of

12. "When a patentee asserts that commercial success supports its contention of nonobviousness, there must of course be a sufficient relationship between the commercial success and the patented invention. The term 'nexus' is often used, in this context, to designate a legally and factually sufficient connection between the proven success and the patented invention, such that the objective evidence should be considered in the determination of nonobviousness. The burden of proof as to this connection or nexus resides with the patentee." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed.Cir. 1988).

nonobviousness where the "evidence of efforts to replicate a specific product" have been proffered in conjunction with evidence of substantial similarity to the patented product. *Wyers v. Master Lock Co.,* 616 F.3d at 1246 ("Not every competing product that arguably falls within the scope of a patent is evidence of copying; otherwise, 'every infringement suit would automatically confirm the nonobviousness of the patent.' *Iron Grip Barbell Co. v. USA Sports, Inc.,* 392 F.3d 1317, 1325 (Fed.Cir.2004)."). VIS asserts that because Samsung had a patent application rejected in light of the publication of the '492 patent's application before the accused products were launched, it should be inferred that the accused products were copied from this publication. Mem. in Opp. at 34, ECF No. 163. This assertion is insufficient to support the assertion of copying because VIS has failed to produce evidence of a specific patented product which Samsung has copied. As such, copying also fails as a secondary consideration supporting nonobviousness.

The only secondary consideration for which there is sufficient supporting evidence, even viewing all the evidence in the light most favorable to VIS, is commercial success. Although commercial success can be a strong indicia of nonobviousness, based on only the evidence presented at the summary judgment stage it would likely fail to rebut the obviousness claim. However, the fourth *Graham* factor, secondary considerations, is only relevant if DLNAv1.0 is valid prior art, which the Court cannot determine at this time due to genuine issues of material fact. The Court therefore denies Defendants' motion for summary judgment on the asserted claims

of the '492 and '711 patents as obvious in light of Palin and DLNAv1.0.

### B. Invalidity of the '398 Patent

Due to its status as a continuation of the '733 patent, which is a continuation-in-part of the '492 patent, the '398 patent contains additional material and is generally entitled to the later priority date of the filing of the continuation-in-part, e.g. the filing date of the '733 patent where the additional material was added, May 22, 2007. As such, a greater pool of prior art is available with regard to the '398 patent than is available with regard to the '492 patent family.

Samsung claims that the earliest priority date that the asserted claims of the '398 patent, claims 15, 58, 60, 61, 62, and 63,[13] are entitled to is March 22, 2007. Mem. in Supp. at 29–30, ECF No. 144. Thus, Samsung claims that all of those claims are anticipated or rendered obvious by the "DLNA Home Networked Device Interoperability Guidelines expanded: October 2006" (hereinafter "DLNAv1.5"), which was publicly available as of October 2006. *Id.* However, VIS argues that DLNAv1.5 is not prior art to the asserted claims of the '398 patent because those claims are entitled to claim priority back to as early as September 22, 2004, and at least back to the date on which the '492 patent's specification included Figure 3, June 24, 2005. Transcript of Mot. for Summ. J. Hearing at 50:12–51:24, ECF No. 396.

While VIS argues that the asserted claims of the '398 patent were conceived as of September 22, 2004, the Court need not determine at this time whether VIS is entitled to claim priority based on conception because priority based on the June 24, 2005 filing of the '492 patent will suffice to

---

**13.** Claim 57 is not addressed here due to counsel's representation at the hearing on the instant motion for summary judgment that claim 57 was no longer being asserted as infringed. Transcript of Mot. for Summ. J. Hearing at 50:14–17, ECF No. 396.

pre-date the asserted prior art reference— DLNAv1.5. As the figure used to assert conception as of September 22, 2004, VIS002975, is the same figure that appears in the '492 patent as Figure 3, there is no disparity in the content to be analyzed to determine priority. Additionally, the filing of the '492 patent functions as constructive reduction to practice for which further corroboration beyond proof of filing is not necessary. *Solvay S.A. v. Honeywell Int'l, Inc.*, 622 F.3d 1367, 1376 (Fed.Cir.2010); *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1169 (Fed.Cir.2006). Thus, as the priority date of the '492 patent will suffice to pre-date DLNAv1.5 as a prior art reference, and the filing of the '492 patent suffices as proof of reduction to practice, there is no need to examine whether evidence of sufficient corroboration has been presented for VIS to successfully claim conception as of September 22, 2004.

### i. Priority Date

"Under 35 U.S.C. § 120, 'a claim in a later application receives the benefit of the filing date of an earlier application so long as the disclosure in the earlier application meets the requirements of 35 U.S.C. § 112, ¶ 1, including the written description requirement, with respect to that claim.'" *Cordance Corp.*, 658 F.3d at 1334 (quoting *Tech. Licensing Corp.*, 545 F.3d at 1326). "While the earlier application need not describe the claimed subject matter in precisely the same terms as found in the claims at issue, the prior application must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, [the inventor] was in possession *of the invention.*'" *Tech. Licensing Corp.*, 545 F.3d at 1331–32 (emphasis in original) (internal citations omitted).

"[O]nce a challenger (the alleged infringer) has introduced sufficient evidence to put at issue whether there is prior art alleged to anticipate the claims being asserted, prior art that is dated earlier than the apparent effective date of the asserted patent claim, the patentee has the burden of going forward with evidence and argument to the contrary." *Tech. Licensing Corp.*, 545 F.3d at 1329. "[H]owever much the burden of going forward may jump from one party to another as the issues in the case are raised and developed," this does not shift Samsung's ultimate burden of proof to show by clear and convincing evidence that the patent is invalid. *Id.*

With regard to the asserted independent claim, claim 15, the only claim limitations on which VIS' assertion of priority is specifically disputed by Samsung is "establishing a predetermined channel operatively in communication with the destination device, and transporting the multimedia content to the destination device via said predetermined channel, for the destination device to display the multimedia content item in conjunction with a navigational command to the destination device for the predetermined channel." Mem. in Supp. at 29–30, ECF No. 144; Rebuttal Br. at 19–20, ECF No. 168. Samsung has presented evidence in the form of the testimony of Dr. Almeroth, supported by citations to VIS' patents and the prosecution history of those patents, that there is no support for this limitation in any specification prior to that filed with the '733 patent. Almeroth Dec. at ¶ 23–29, ECF No. 136.

The evidence presented by Samsung is asserted to show that when the above limitation was added to the claims, the support cited to for the addition of this limitation was column 26, lines 41–55 of the '733 specification, which describe the process depicted in Figure 17 of the '733 specification. *Id.* at ¶ 26–28. The language of column 26, lines 41:55 of the '733 specification is not present in the '492 specification and neither is the figure to which it refers.

However, VIS asserts that sufficient support for this limitation can be found in Figure 3 of the '492 specification. Transcript of Mot. for Summ. J. Hearing at 51:1–23, ECF No. 396. The claim construction for the term "establishing a predetermined channel" was determined by this Court to be "specifying a communication pathway." *Markman* Opinion, 976 F.Supp.2d at 828, ECF No. 198. Based on this broad construction of the term "establishing a predetermined channel," this Court construed the term "in conjunction with a navigational command to the destination device for the predetermined channel" to mean "in conjunction with a command to the destination device to select the communication pathway." *Id.* at 829. In construing these claim terms, the Court found the '733 specification's description of various "communication channel[s]," such as USB, TV cable, Ethernet, Bluetooth, WLAN, Satellite, DSL, etc., instructive.[14] *Id.* at 824–25. Based on this understanding of the terms within this limitation, the Court will now examine VIS' assertion that Figure 3 of the '492 specification provides sufficient support, within the meaning of 35 U.S.C. § 112, ¶ 1, for claim 15 of the '398 patent to claim priority back to the date at which the Figure was included in the '492 specification.

The relevant portion of Figure 3 of the '492 specification depicts a converted video signal being sent from a video encoder to a display terminal via a selection of communication pathways. '492 patent at Fig. 3.

The communication pathways depicted in Figure 3 are DVI, DVI–D, HDMI, IEEE 1394, S-video, RGBHV, RGBS, and EIA7703. *Id.* These connections are communications pathways contemplated within the definition of "communication channel" used by the '398 specification.

It is inherent that, in order for the converted video signal to be sent from the mobile terminal along a specific communication pathway, there must be something which specifies the communication channel. In specifying a communication channel, it is also inherent that communication with the destination device must occur for transmission over the communication channel to take place. Additionally, it would be known by a person having skill in the art that executable program code stored in a memory could perform "specifying a communication channel." Thus, Figure 3 of the '492 specification reasonably conveys that the inventor was in possession of the limitations "establishing a predetermined channel operatively in communication with the destination device, and transporting the multimedia content to the destination device via said predetermined channel, for the destination device to display the multimedia content item" of claim 15 of the '398 patent at the time that Figure 3 was included in the filing of the '492 patent, June 24, 2005. *Tech. Licensing Corp.*, 545 F.3d at 1329.

 However, there is no support within Figure 3 or the associated descrip-

---

**14.** "Although the '733 specification's use of the term 'predetermined channel' does little to elucidate the proper construction of this term, the Court finds its related descriptions of various 'communication channel[s]' to be instructive. Specifically, the '733 specification describes 'communication channels between the MC System and the various local user terminals,' such as:

(1) direct connection[s] using the available transmission port/standard such as USB,

RS232, TV cable, Ethernet, Telephone line, etc.; (2) Wireless Personal Area Network[s] such as UWB, Bluetooth, WLAN, etc.; (3) Long-range wireless connections such as WiMax, Satellite, e.g., VSAT, TV broadcast, etc' or (4) Wire-line connection such as DSL, Cable, Ethernet, etc.

'733 patent at 25:13–29." *Markman* Opinion, 976 F.Supp.2d at 825, ECF No. 198.

tion in the '492 specification for sending the converted video "in conjunction with *a command to the destination device to select* the communication pathway." *See,* '492 patent at Fig. 3 & 6:26–60. The first paragraph of 35 U.S.C. § 112 requires that:

> [t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention

"[T]he test for sufficiency of support in a parent application is whether the disclosure of the application relied upon 'reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter.' '" *Vas–Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1563 (Fed. Cir.1991) (internal citations omitted). There is no depiction of an action occurring at the display terminal in Figure 3 beyond the display terminal's receipt of the converted "multimedia data stream." Thus, there is no support for a requirement that the display terminal also select the communication channel at the same time as the mobile terminal is selecting the communication channel and sending the converted signal via the communication channel. Consequently, there is no support for a command to instruct the display terminal to do so. Therefore, Figure 3 of the '492 specification does not reasonably convey that the inventor was in possession of the limitation "in conjunction with a navigational command to the destination device for the predetermined channel" of

claim 15 of the '398 patent at the time that Figure 3 was included in the filing of the '492 patent, June 24, 2005. *Tech. Licensing Corp.,* 545 F.3d at 1329. Claim 15 of the '398 patent, and all associated dependent claims, thus are not entitled to claim priority back to June 24, 2005.[15] The applicable priority date for the asserted claims of the '398 patent remains March 22, 2007, the filing date of the '733 patent, and DLNAv1.5 remains valid prior art.

### ii. Anticipation

■ "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp.,* 339 F.3d at 1377. Samsung asserts that DLNAv1.5 anticipates claims 15, 60, 61, 62, and 63 of the '398 patent. VIS does not dispute DLNAv1.5's anticipation of claims 15, 60, 61, and 62 other than the above discussed assertion of entitlement to an earlier priority date. As the Court has already concluded that DLNAv1.5 is prior art to the '398 patent, with no other disputes as to anticipation, the Court determines that claims 15, 60, 61, and 62 of the '398 patent are invalid as anticipated by DLNAv1.5.

### iii. Obviousness

In addition to anticipation by DLNAv1.5, Samsung asserts that DLNAv1.5 in combination with Rakib renders obvious any asserted claims of the '398 patent not already anticipated by DLNAv1.5 alone. Mem. in Supp., 26, ECF No. 144. The only claims not already anticipated by DLNAv1.5 alone are claims 58 and 63 of the '398 patent.

Again, the *Graham* factors that inform the obviousness analysis are as follows: "(1) the scope and content of the prior art,

---

**15.** As VIS indicates that the claim of conception as of September 22, 2004 would be based on a diagram on which Figure 3 of the '492

patent was based, it is unlikely that 35 U.S.C. § 122, ¶ 1 would be satisfied by that diagram either.

(2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others." *Wyers v. Master Lock Co.*, 616 F.3d at 1237 (citing *Graham*, 383 U.S. at 17–18, 86 S.Ct. 684). As discussed above, the parties do not appear to dispute the level of ordinary skill in the art, and the third *Graham* factor is therefore uncontested. Additionally, as the secondary considerations remain the same for both the '398 patent as for the '492 patent family, the discussion of the fourth *Graham* factor set forth above is equally applicable to the '398 patent. Thus, only the first and second *Graham* factors will be discussed below with regard to the '398 patent.

The availability of Rakib as a prior art reference for the asserted claims is not disputed and the dispute with regard to DLNAv1.5 as a prior art reference has been resolved above. The only dispute raised by VIS as to claims 58 and 63 is whether the combination of HDMI with DLNAv1.5 would have been obvious to a person having ordinary skill in the art. Samsung does not argue that Rakib discloses the transmission of uncompressed data or that the addition of HDMI to Rakib would be obvious, thus, examination of Rakib is unnecessary.

 As stated above, VIS asserts that DLNAv1.5 does not disclose HDMI and, contrary to Samsung's assertions, that it would not have been obvious to a person having ordinary skill in the art to combine DLNAv1.5 with HDMI. Mem. in Opp. at 29, ECF No. 163. VIS asserts that, like Palin, DLNAv1.5 is used to transmit compressed data, while HDMI is used to transmit uncompressed data. *Id.* In support, VIS cites to the Brody Declaration, which states in conclusory fashion that

DLNA supports the transmission of compressed data. *Id.* at 29 & Ex. A at ¶ 31. However, Samsung asserts that DLNAv1.5 discloses guidelines for connecting consumer electronics on a home network, not a type of compression format, device interface, or transmission protocol. Rebuttal Br. at 20–21, ECF No. 168. Samsung further asserts that DLNAv1.5's provision for "Digital Media Player functions to 'play the content locally on the DMP' makes implicit decompression of the MPEG-formatted video files specified by DLNAv1.5." *Id.* at 21. Whether this provision in DLNAv1.5 is sufficient to make implicit a decompression of the video files prior to transmission, as required for use of HDMI as a method of transmission, is at least a genuine dispute of material fact and thus precludes a grant of summary judgment of invalidity of claim 63 of the '398 patent.

With regard to the HDMI limitation, both parties make the same assertions and arguments for claim 58 of the '398 patent as they did with respect to claim 63 of the '398 patent. As such, the same analysis applies with regard to claim 58 of the '398 patent. Therefore, summary judgment of invalidity of claims 58 and 63 of the '398 patent is denied due to the existence of a genuine dispute of material fact.

### C. Willful Infringement

 Establishing willful infringement, which permits recovery of enhanced damages, requires a patentee to make a showing of "objective recklessness." *In re Seagate Tech., LLC*, 497 F.3d at 1371. To satisfy such standard, a patentee must demonstrate "by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id.* "The state of mind of the accused infringer is not relevant to this [threshold] objective inquiry." *Id.* Only if it is determined that such objective standard is met

must the subjective knowledge inquiry be examined. *Id.*

 Although summary judgment requires that the evidence be viewed in a light most favorable to the nonmovant, in this case Plaintiff, this does not shift the burden of proof. *Apple Computer, Inc.,* 234 F.3d at 20. Thus, on willful infringement at the summary judgment stage, the burden remains on Plaintiff to establish by clear and convincing evidence that Defendants willfully infringed the asserted patents. As noted above, the Federal Circuit has "established the rule that generally the 'objective prong of *Seagate* tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement.'" *Bard Peripheral Vascular, Inc.,* 682 F.3d 1003, 1005–06 (Fed.Cir. 2012) *cert. denied,* —— U.S. ——, 133 S.Ct. 932, 184 L.Ed.2d 752 (2013) (quoting *Spine Solutions, Inc.,* 620 F.3d at 1319).

Samsung submits that there are no genuine issues of material fact with regard to whether Samsung relies on a good faith invalidity argument, which reliance causes the objective prong of *Seagate* to not be met. Mem. in Supp. at 36, ECF No. 144. Samsung contends that the Court should therefore grant summary judgment on this issue and dismiss the willful infringement claim. *Id.* In opposing Samsung's motion for summary judgment, VIS focuses on Samsung's subjective knowledge of the patents-in-suit. Mem. in Opp. at 35, ECF No. 163. VIS asserts that there is a genuine issue of material fact as a jury could reasonably conclude from the undisputed facts, together with Exhibits 11 and 20, and the Brody Declaration, that Samsung had knowledge of the patents-in-suit. *Id.* at 35–37. However, the subjective knowledge inquiry—an alleged infringer's subjective knowledge of the patents-in-suit—is only reached once a showing has been made that meets the objective recklessness

standard. *In re Seagate,* 497 F.3d at 1371. Indeed, the Federal Circuit has expressly stated that where "the court determine[s] that the infringer's reliance on a defense was not objectively reckless, it *cannot* send the question of willfulness to the jury, since proving the objective prong is a predicate to consideration of the subjective prong." *Powell v. Home Depot U.S.A., Inc.,* 663 F.3d 1221, 1236 (Fed.Cir.2011) (citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 1335–37 (Fed.Cir.2009)) (emphasis added).

 The threshold determination of objective recklessness "entails an objective assessment of potential defenses based on the risk presented by the patent." *Bard Peripheral Vascular, Inc.,* 682 F.3d at 1006. Thus, the question is "whether a defense or noninfringement theory was 'reasonable.'" *Id.* (citing *Powell,* 663 F.3d at 1236). Moreover, a mere assertion of an invalidity defense will not necessarily negate a claim of willful infringement. *See i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 860 (Fed.Cir.2010) *aff'd,* —— U.S. ——, 131 S.Ct. 2238, 180 L.Ed.2d 131 (U.S. 2011).

When a defense or noninfringement theory asserted by an infringer is purely legal (e.g., claim construction), the objective recklessness of such a theory is a purely legal question to be determined by the judge. *See Powell,* 663 F.3d at 1236. When the objective prong turns on fact questions, as related, for example, to anticipation, or on legal questions dependent on the underlying facts, as related, for example, to questions of obviousness, the judge remains the final arbiter of whether the defense was reasonable, even when the underlying fact question is sent to a jury. *See Powell,* 663 F.3d at 1236–37; *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 1324 (Fed.Cir.2009) (explain-

ing that ensnarement has underlying factual issues but is ultimately a question of law for the judge that is " 'to be determined by the court, either on a pretrial motion for partial summary judgment or on a motion for judgment as a matter of law at the close of the evidence and after the jury verdict' " (quoting *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997))).

*Bard Peripheral Vascular, Inc.*, 682 F.3d at 1007.

■■■ In this case, Samsung asserts invalidity based on anticipation and obviousness. As demonstrated by the analysis above, Samsung's defense of patent invalidity is a reasonable one. The Federal Circuit has already recognized that, where there is a genuine issue of material fact which prevents a decision at the summary judgment stage and the factual question is a close one on which the jury could reasonably find for either party, the defense of invalidity is a reasonable one. *See DePuy Spine, Inc.*, 567 F.3d at 1337 (where the court held that "[w]hile the fact that an issue was submitted to a jury does not automatically immunize an accused infringer from a finding of willful infringement," where the record, viewed objectively, indisputably shows that the question submitted was one that required "an intensely factual inquiry," the fact that the jury ultimately found in favor of the patentee on the issue does not diminish the difficulty of the jury's task or the reasonableness of the defense.) (citing *Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1381 (Fed.Cir.2000)). If a defense, which was ultimately rejected by the jury, can nevertheless be considered reasonable due to the intensely factual inquiry involved in ruling on the defense, then Samsung's defense, which has been granted in

part at the summary judgment stage, must be reasonable. Therefore, based on the analysis above, the defenses asserted by Samsung are objectively reasonable and an objectively high likelihood of infringement is not found under *In re Seagate's* first prong.

Furthermore, despite VIS' assertions to the contrary, an alleged infringer is not required to show contemplation of defenses to a potential infringement action before pursuit of the allegedly infringing activities. Specifically, the Federal Circuit in *In re Seagate*, in overruling *Underwater Devices Inc. v. Morrison–Knudsen Co., Inc.*, 717 F.2d 1380, 1389 (Fed.Cir.1983), eliminated the affirmative duty of care from the context of willful infringement. Prior to *In re Seagate*, the standard set forth in *Underwater Devices* required that where "a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing." *Underwater Devices Inc.*, 717 F.2d at 1389 (Fed.Cir.1983), *overruled by In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed.Cir.2007). The Federal Circuit stated that "[b]ecause we abandon the affirmative duty of due care, we also reemphasize that there is no affirmative obligation to obtain opinion of counsel." *In re Seagate Tech., LLC*, 497 F.3d at 1371. Requiring that, in order to have a "reasonable" defense, a potential infringer formulate the defense *before* taking any action that might potentially infringe the patent, would essentially impose an affirmative obligation to obtain the opinion of counsel—a proposition rejected by the Federal Circuit's opinion in *In re Seagate*. Such an interpretation would also conflate the subjective knowledge inquiry of the second prong of *In re Seagate* with the objective recklessness standard of the first prong. Therefore, since there is no affirmative obligation to obtain the opinion of counsel, *Id.*, there is no require-

ment that an accused infringer prove that formulation of their defense occurred prior to the allegedly infringing actions, or even prior to the filing of the infringement suit.

## V. CONCLUSION

For the reasons stated above, Defendants' summary judgment motion is hereby **GRANTED, in part, and DENIED, in part.** ECF No. 134.

Defendants' motion is **GRANTED** as to the invalidity of claims 21, 22, 25, 28, and 29 of the '268 patent as anticipated by U.S. Patent Wo. 7,850,005 ("Palin"). Defendants' motion is **GRANTED** as to claims 15, 60, 61 and 62 of the '398 patent as anticipated by "DLNA Home Networked Device Interoperability Guidelines expanded: October 2006" (hereinafter "DLNAv1.5").

Defendants' motion is **DENIED** as to invalidity of claim 27 of the '268 patent. Defendants' motion is **DENIED** as to invalidity of all asserted claims of the '492 patent. Defendant's motion is **DENIED** as to invalidity of all asserted claims of the '711 patent. Defendants' motion is **DENIED** as to invalidity of all asserted claims of the '381 patent. Defendants' motion is **DENIED** as to invalidity of claims 58 and 63 of the '398 patent.

Defendants' motion is **GRANTED** as to a finding of no willful infringement.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

1. On April 10, 2014, the Court held a hearing on the motion for reconsideration, but the hearing focused more on issues relating to the *inter partes* review, and its effect on pending district court proceedings, than the substance of the motion to reconsider. Hr'g Tr., ECF NO. 554.

## OPINION AND ORDER

Plaintiff, Virginia Innovation Sciences, Inc. ("Plaintiff" or "VIS"), asks this Court to reconsider its January 8, 2014 summary judgment Order granting, in part, the summary judgment motion of invalidity filed by defendants, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively "Samsung" or "Defendants"). ECF No. 416. Plaintiff asserts that new evidence justifies reconsideration of the summary judgment Order because, during the course of an *inter partes* review ("IPR") proceeding, the United States Patent and Trademark Office's ("PTO") Patent Trial and Appeal Board ("PTAB") issued preliminary decisions regarding institution of IPR on the patents-in-suit, with conclusions that are partially different from this Court's summary judgment Order. The motion has been fully briefed and is therefore ripe for decision.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. General Background

At issue in this case are five[2] patents: U.S. Patent No. 7,899,492 ("the '492 patent"), U.S. Patent No. 8,050,711 ("the '711 patent"), U.S. Patent No. 8,145,268 ("the '268 patent"), U.S. Patent No. 8,224,381 ("the '381 patent"), and U.S. Patent No. 8,135,398 ("the '398 patent"). All of the patents-in-suit are continuations or continuations-in-part of the '492 patent, titled "Methods, Systems and Apparatus for Displaying the Multimedia Information from

2. Previously, there were six patents at issue in this case. However, U.S. Patent No. 7,957,-733 ("the '733 patent") is no longer asserted as infringed. Agreed Dismissal Order, ECF No. 408.

Wireless Communication Networks." The patents-in-suit address the conversion of mobile terminal multimedia signals into a format for use by an alternative display, and each of the patents-in-suit describes inventions intended to resolve the inconvenience and impracticability of viewing multimedia content on the small screens of mobile terminals.

In the instant patent infringement action, filed on October 4, 2012, 2:12cv548 (hereinafter "VIS I"), Plaintiff alleges that Defendants have directly, indirectly, and willfully infringed the patents-in-suit by making, using, offering for sale, selling, and/or importing a wide range of accused products, including smartphones, tablets, Blu-ray players, and hubs. Pl.'s Am. Compl., ECF No. 121. Samsung denies VIS's claims of infringement and asserts several affirmative defenses, including invalidity or unenforceability of all patents-in-suit, prosecution history estoppel, and other equitable doctrines. Additionally, Samsung asserts counterclaims seeking declarations of non-infringement, invalidity, and unenforceability for each of the patents-in-suit.

On June 14, 2013, three days after the Court conducted a *Markman* hearing, Plaintiff filed a second patent infringement action, 2:13cv332 (hereinafter "VIS II"), alleging essentially the same causes of action as in VIS I, but with respect to Defendants' newly released products. Case No. 2:13cv332, ECF No. 1. In response, Samsung asserted essentially the same defenses and counterclaims as in VIS I. By Order of October 25, 2013, the Court joined for trial VIS I and VIS II, as the matters involve the same parties and the same patents-in-suit. ECF. No. 353. The Court then issued a new scheduling Order for the joined cases, and rescheduled the November 12, 2013 trial to April 21, 2014. Case No. 2:13cv332, ECF No. 63. Pursu-

ant to that scheduling Order, the parties narrowed the issues for trial and Plaintiff made its final election of claims it would assert at trial, none of which is the subject of Plaintiff's motion for reconsideration. The April 21, 2014 trial of the two joined cases has been continued to May 27, 2014.

### B. Summary Judgment and IPR

On August 13, 2013, Defendants filed a motion for summary judgment in this Court, seeking, among other things, a ruling of invalidity as to the patents-in-suit. On January 8, 2014, the Court ruled on Defendants' summary judgment motion in VIS I; granting, in part, and denying, in part, such motion. ECF No. 413. The Court found no willful infringement of any claims, and also found claims 21, 22, 25, 28, and 29 of the '268 patent, and claims 15, 60, 61 and 62 of the '398 patent, invalid as anticipated or obvious. *Id.* It is these findings of invalidity that Plaintiff asks the Court to reconsider, particularly the invalidity finding of claim 21 of the '268 patent as anticipated by prior art reference "Palin."

On September 5, 2013, at the same time VIS I and VIS II were proceeding before this Court, *and while Defendant's summary judgment motion seeking a ruling of invalidity was pending,* Defendants began parallel proceedings before the PTO directly challenging the validity of the patents-in-suit. Shortly thereafter, on September 16, 2013, Defendants submitted to the PTO corrected petitions seeking IPR of 37 claims from the five patents-in-suit. Because the Director of the PTO has delegated the authority to institute IPR to the PTAB, the IPR petitions were submitted to the PTAB for consideration. *Each of the claims* that Defendants asked this Court to find invalid in their August 13, 2013 summary judgment motion of invalidity were included in the 37 claims that Defendants asked the three judge panel of

the PTAB to find invalid in Defendants' September 16, 2013 IPR petitions.

Although the parties to this litigation notified the PTAB of the August 13, 2013 summary judgment motion pending before this Court, *neither party advised this Court of the concurrent IPR petitions* or requested a stay of Court proceedings pending a decision from the PTAB. Thus, on January 8, 2014, this Court issued its 72 page Opinion and Order ruling on the validity of the patents-in-suit without any knowledge that the exact same issues were the subject of an IPR petition pending before a three judge panel of the PTAB.

On March 6, 2014, the PTAB rendered its decisions regarding whether to instate IPR review of the five patents-in-suit, granting the request to review three of the patents ('268, '381, and '398), and denying the request to review two of the patents ('492 and '711). Pl.'s Reconsideration Mem., Exs. 1–5, ECF No. 417. Approximately one week later, the Court was finally apprised of the IPR proceedings when Plaintiff filed its motion for reconsideration of the Court's summary judgment ruling. ECF. No. 416. Plaintiff's brief in support of its motion highlights the substantive analysis included within the PTAB's decisions and argues that such rulings constitute "new evidence that was not available prior to this Court's Summary Judgment Order." Pl.'s Reconsideration Mem. 2, ECF No. 417. Moreover, Plaintiff argues that the PTAB's decisions should be afforded deference based on the PTAB's specialized knowledge and expertise. *Id.* at 4.

## II. IPR AND THE DUTY OF CANDOR

Before addressing the motion to reconsider, the Court must address the IPR provisions of the Leahy–Smith America Invents Act ("AIA"), Pub.L. No. 112–29, 125 Stat. 284 (2011), codified at 35 U.S.C. §§ 311–319, and the impact of the IPR proceedings on the district court proceedings.

### A. The IPR Procedure

The IPR procedure enacted by Congress in 2011 allows third parties to challenge a patent's validity by seeking IPR. "The IPR process set out in the AIA represents a 'new, more streamlined adjudicative proceeding' intended to replace the more cumbersome and time-consuming *inter-partes* reexamination that could take upwards of three years to conclude." *Rensselaer Polytechnic Institute v. Apple Inc.,* No. 1:13cv633, 2014 WL 201965, at *2, 2014 U.S. Dist. LEXIS 5186, at *5 (N.D.N.Y. Jan. 15, 2014) (hereinafter *"Rensselaer"*) (quoting *Ultratec, Inc. v. Sorenson Commc'ns, Inc.,* No. 13–CV–346, 2013 WL 6044407, at *1, 2013 U.S. Dist. LEXIS 162459, at *3 (W.D.Wisc. Nov. 14, 2013)); *see Abbott Labs. v. Cordis Corp.,* 710 F.3d 1318, 1326 (Fed.Cir.2013) (recognizing that the AIA changed the PTO's review process from "an *examinational* to an *adjudicative* proceeding") (emphasis added). IPR "is designed to improve upon the previous inter *partes* re-examination process by '(1) ... reduc[ing] to 12 months the time the PTO spends reviewing validity, from the previous reexamination average of 36.2 months; (2) ... minimiz[ing] duplicative efforts by increasing coordination between district court litigation and *inter partes* review; and (3) ... allow[ing] limited discovery in the review proceedings.'" *Automatic Mfg. Sys., Inc. v. Primera Technology, Inc.,* No. 6:12cv1727, 2013 WL 6133763, at *2, 2013 U.S Dist. LEXIS 165692, at *5 (M.D.Fla. November 21, 2013) (quoting *Universal Elecs., Inc. v. Universal Remote Control, Inc.,* 943

F.Supp.2d 1028, 1029–30 (C.D.Cal.2013))[3] (alteration in original).

"Under the procedures governing IPR, which became effective on September 16, 2012, a request for review must be filed by the petitioner within one year of being served with a complaint alleging infringement of the patent in issue." *Rensselaer*, 2014 WL 201965, at *2, 2014 U.S. Dist. LEXIS 5186, at *5 (citing 35 U.S.C. § 315(b)). "On *inter partes review*, a petitioner can challenge the validity of a patent only on grounds that could be raised under 35 U.S.C. § 102 (prior art) or 35 U.S.C. § 103 (obviousness), and only then 'on the basis of prior art consisting of patents or printed publications.'" *Automatic Mfg. Sys.*, 2013 WL 6133763, at *2, 2013 U.S. Dist. LEXIS 165692, at *5–6 (quoting 35 U.S.C. § 311(b)). "Once an IPR petition is filed, the patent owner may submit a preliminary response within three months, or may instead expedite the process by waiving the right to submit a preliminary response." *Rensselaer*, 2014 WL 201965, at *2, 2014 U.S. Dist. LEXIS 5186, at *6 (citing 35 U.S.C. § 313; 37 C.F.R. § 42.107(b)). "An IPR trial may be initiated by the PTO if the petitioner demonstrates a reasonable likelihood of prevailing with respect to at least one challenged claim." *Id.* at *2, 2014 U.S. Dist. LEXIS 5186, at *7 (citing 35 U.S.C. § 314(a)). "The PTO must decide whether to institute IPR within three months of the filing of the preliminary response, or, if no response is filed, [within three months of] [ ] the last date on which a response may be filed." *Evolutionary Intelligence LLC v. Yelp Inc.*, No. 13–CV–3587, 2013 WL 6672451, at *2, 2013 U.S. Dist. LEXIS 178547, at *7 (N.D.Cal. Dec. 18, 2013) (citing 35 U.S.C. § 314(b)). "The Director [of the PTO], by regulation, has delegated to the [PTAB] the authority under section 314 to decide whether to institute an *inter partes* review." *St. Jude Medical, Cardiology Div., Inc. v. Volcano Corp.*, 749 F.3d 1373, 1375 n. 1, 2014 WL 1623676, at *2 n. 1 (Fed.Cir.2014) (citing 37 C.F.R. §§ 42.4 & 42.108). Accordingly, when the PTAB makes "the review-instituting decision, it is exercising the Director's section 314 authority." *Id.*

As the *Rensselaer* court noted, "[u]nlike the prior *inter partes* reexamination proceeding, which was accomplished largely through submissions before a PTO examiner, IPR under the AIA is conducted before a panel of three of the technically-trained administrative judges comprising the Patent Trial and Appeal Board ('PTAB')." *Rensselaer*, 2014 WL 201965, at *2, 2014 U.S. Dist. LEXIS 5186, at *7–8 (citing 35 U.S.C. § 6(a), (c)). "On review, [this PTAB three judge panel of] the PTO can invalidate any claim before it, and the petitioner is collaterally estopped from later asserting in a civil action 'that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter *partes* review.'" *Automatic Mfg. Sys.*, 2013 WL 6133763, at *2, 2013 U.S. Dist. LEXIS 165692, at *6 (citing 35 U.S.C. § 315(e)(2)). If the "IPR is initiated, the PTAB must issue a final determination within one year after commencement, although that period may be extended, for good cause, to eighteen months." *Rensselaer*, 2014 WL 201965, at *2, 2014 U.S. Dist. LEXIS 5186, at *8 (citing 35 U.S.C. § 316(a)(11)). Any "party dissatisfied with the PTAB's final decision may appeal the determination to the Federal Circuit." *Id.* (citing 35 U.S.C.

---

**3.** In *Universal Electronics,* the Court's summary of the improvements resulting from the new IPR procedure relied on *Changes to Implement Inter Partes Review Proceedings, Post-* *Grant Review Proceedings, and Transitional Program for Covered Business Method Patents,* 77 Fed.Reg. 48,680 (Aug. 14, 2012) (codified at 37 C.F.R. §§ 42.100 et seq.).

§ 141). "Given this timeframe, IPR can take [up to] two years before the PTO, and an appeal to the Federal Circuit can extend that timeline further." *Id.* Of course, IPR can also take less than two years under these timeframes, and the preclusive effect of a PTAB final determination is triggered when the PTAB issues its final written decision—regardless of whether an appeal is taken to the Federal Circuit. *Compare* 35 U.S.C. §§ 315(e), 318, and 319 (triggering estoppel upon issuance of PTAB final determination on IPR), with *Bettcher Indus., Inc. v. Bunzl USA Inc.*, 661 F.3d 629, 642–47 (Fed.Cir.2011) (triggering estoppel when all court review of *inter partes* reexamination determination has been exhausted).

The impact of the new IPR procedure is only beginning to be experienced. Empirical data as of April 17, 2014 reflect that, in fiscal year 2013, there were 203 decisions issued by the PTAB regarding institution of *inter partes* review. Patent Trial and Appeal Board, AIA Progress, http://www.uspto.gov/ip/boards/bpai/stats/041714_aia_stat_graph.pdf. Of the 203, trials were instituted in 167, 10 were joined with existing proceedings, and 26 were denied—meaning that trial was instituted in approximately 87% of the cases. *Id.* Thus far in fiscal year 2014, there were 335 decisions issued by the PTAB regarding institution of inter *partes* review. *Id.* Of the 335, trials were instituted in 267, 1 was joined with an existing proceeding, and 67 were denied—meaning that the percentage

of trials instituted dropped somewhat to approximately 80%. *Id.*

### B. Impact of IPR on District Court Litigation

A party simultaneously litigating a patent infringement case in federal court and an IPR proceeding before the PTAB must consider the impact of each proceeding on the other. For example, the AIA provides that "[i]f the petitioner or real party in interest files a civil action challenging the validity of a claim of the patent on or after the date on which the petitioner files a petition for inter partes review of the patent, that civil action will be automatically stayed until either the patent owner moves the court to lift the stay, the patent owner files a civil action or counterclaim alleging that the petitioner or real party in interest has infringed the patent, or the petitioner or real party in interest moves the court to dismiss the civil action." 60 Am.Jur.2d *Patents* § 411 (2014) (citing 35 U.S.C. § 315(a)(2)). However, "[a] counterclaim challenging the validity of a claim of a patent does not constitute a civil action challenging the validity of a claim of a patent" within the meaning of 35 U.S.C. § 315(a)(2). *Id.* (citing 35 U.S.C. § 315(a)(3)). Therefore, when an IPR petition is filed by a party to district court patent infringement litigation involving invalidity counterclaims, the AIA does not contain a mandatory provision requiring a stay of the district court patent infringement proceedings.[4] Accordingly, the deci-

---

4. When the AIA was introduced as H.R. 1249 in the House of Representatives, it contained a section 320, describing criteria a district court should use in deciding whether to grant a stay of such litigation. However, section 320 was later omitted by amendment before the AIA was adopted. Section 320 provided that: "If a party seeks a stay of a civil action alleging infringement of a patent under section 281, or a proceeding before the International Trade Commission under section 337 of

the Tariff Act of 1930, relating to an inter partes review under this chapter, the court shall decide whether to enter a stay based on (1) whether a stay, or the denial thereof, will simplify the issues in question, and streamline the trial; (2) whether discovery is complete and whether a trial date has been set; (3) whether a stay, or the denial thereof, would unduly prejudice the non-moving party or present a clear tactical advantage for the moving party; and (4) whether a stay, or the

sion of whether to stay the district court proceedings in such a scenario is left to the district court's discretion—that is, *if* the district court knows about the IPR proceeding. *See Procter & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 848–49 (Fed.Cir.2008) ("The Supreme Court has long recognized that district courts have broad discretion to manage their dockets, including the power to grant a stay of proceedings.").

Here, it seems obvious to this Court that VIS and Samsung should have notified the Court that IPR petitions were filed in September 2013, and that such IPR petitions addressed the same assertions of invalidity that were then being considered by the Court. However, because counsel for both parties assert that it never oc- curred to them that they had a duty to notify this Court, it is necessary to review such duty and remind counsel of their obligation to the Court with respect to such duty.[5]

### 1. Duty of Candor and Good Faith

■ This Court has adopted a local rule regarding the ethical standards applicable to cases before the Court. It provides that "[t]he ethical standards relating to the practice of law in civil cases in this Court shall be Section II of Part Six of the Rules of the Virginia Supreme Court as it may be amended or superseded from time to time." E.D. Va. Loc. Civ. R. 83.1. Rule 3.3 of those Rules of Professional Conduct is entitled "Candor Toward The Tribunal." Va. Rule Prof'l Conduct 3.3. Subsection (a)(2) of that Rule provides that "[a] law-

denial thereof, will reduce the burden of litigation on the parties and on the court." H.R. Doc. No. 112–35 at 16 (2011). The omission of such provision from the final version of the statute means that a district court remains free to use its own discretion, and appropriate factors, in exercising its inherent power to grant or deny a stay. *See Procter & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 849 (Fed.Cir.2008) (explaining that former 35 U.S.C. § 318 involving reexamination only supplemented the "inherent power of the district courts to grant a stay pending reexamination of a patent"); *see also Cherokee Nation of Oklahoma v. United States*, 124 F.3d 1413, 1416 (Fed.Cir.1997) (describing balancing test for staying action); *Peschke Map Techs., LLC v. J.J. Gumberg Co.*, —— F.Supp.2d ——, ——, Civ. Nos. 12–1525, 1527, 1528, 1530, 1572 & 1574, 2014 WL 1652633, at *1, 2014 U.S. Dist. LEXIS 57113, at *5 (D.Del. Apr. 24, 2014) (granting stay pending PTAB *inter partes* review); *ePlus, Inc. v. Lawson Software, Inc.*, No. 3:09cv620, 2010 WL 1279092, *1–2, 2010 U.S. Dist. LEXIS 31322, *5 (E.D.Va. Mar. 31, 2010) (applying stay standard in patent case involving patent reexamination).

5. During the April 10, 2014 hearing before this Court, Plaintiff stated that the failure to advise this Court of the pending PTAB proceeding was not intentional, and that counsel had never even discussed or considered whether they should advise the Court of the concurrent PTAB proceeding. Hr'g Tr. 7–8, ECF No. 554. In a post-hearing brief, VIS later stated that "Samsung raised its intention to file IPR requests when the parties met with Magistrate Judge Miller on August 29, 2013 for a settlement conference in VIS I." ECF No. 558. The Court takes the parties at their word regarding their assertions that they did not *intend* to conceal such PTAB proceedings when they failed to advise this Court of the IPR. However, it must be noted that the discussions that occur during settlement conferences are confidential. In order to encourage the parties to enter into candid and fulsome discussions, the district judge and magistrate judge co-assigned to cases do not discuss the substance of such settlement conferences. This policy is reflected in the Settlement Conference Order entered by Judge Miller on July 24, 2013, which provides that "[t]he undersigned will not disclose the information received during the settlement conference to anyone without the permission of the party providing the information." ECF No. 118. Moreover, E.D. Va. Loc. Civ. Rule 83.6(e) describes the rules governing mediation, including settlement conferences, and provides that "[t]he substance of communications in the mediation process shall not be disclosed to any person other than participants in the mediation process."

yer shall not knowingly ... fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client." *Id.* Comment 1 to the Rule observes that "[t]he advocate's task is to present the client's case with persuasive force. Performance of that duty while maintaining confidences of the client is qualified by the advocate's duty of candor to the tribunal." *Id.* Comment 3 to the Rule, entitled "Representations by a Lawyer," further provides that "[t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." *Id.* In addition to the Rule 3.3 duty of candor, there is also a broader general duty of candor and good faith that encompasses an attorney's duty to advise a district court of any development that may affect the outcome of the litigation. *United States v. Shaffer Equip. Co.,* 11 F.3d 450, 457–59 (4th Cir. 1993). These general principles, and the relationship between this general duty to advise and the Rule 3.3 duty of candor, have been discussed at length by the United States Court of Appeals for the Fourth Circuit.

In the following passage from *Shaffer Equipment,*[6] the Fourth Circuit explained how these two duties apply:

It appears that the district court, in finding that the government's attorneys violated a duty of candor to the court, applied the general duty of candor imposed on all attorneys as officers of the court, as well as the duty of candor defined by Rule 3.3. Although the court referred to Rule 3.3, it also described the duty of candor more broadly as that duty attendant to the attorney's role as

an officer of the court with a "continuing duty to inform the Court of any development which may conceivably affect the outcome of litigation." [*United States v. Shaffer Equip. Co.,* 796 F.Supp. 938, 950 (S.D.W.Va.1992).] It concluded, "Thus, attorneys are expected to bring directly before the Court all those conditions and circumstances which are relevant in a given case." *Id.* In its brief, the government did not address the existence, nature, and scope of any general duty of candor and whether its attorneys violated that duty. Nevertheless, we are confident that a general duty of candor to the court exists in connection with an attorney's role as an officer of the court.

Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. However, because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions—all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition. Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process. As soon as the process falters in that respect, the people are then justified in abandoning support for the system in favor of one where honesty is preeminent.

While no one would want to disagree with these generalities about the obvi-

---

**6.** In *Shaffer Equipment,* the district court found that government attorneys breached their duty of candor in their efforts to recover the EPA's costs of cleaning up a hazardous waste site. The EPA on-site coordinator misrepresented his academic achievements and credentials and the government's attorneys wrongfully obstructed the defendants' efforts to "root out the discrepancies and failed to reveal them once they learned of them." 11 F.3d 450, 452.

ous, it is important to reaffirm, on a general basis, the principle that lawyers, who serve as officers of the court, have the first line task of assuring the integrity of the process. Each lawyer undoubtedly has an important duty of confidentiality to his client and must surely advocate his client's position vigorously, but only if it is truth which the client seeks to advance. The system can provide no harbor for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end. It is without note, therefore, that we recognize that the lawyer's duties to maintain the confidences of a client and advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit. *See* 1 Geoffrey C. Hazard, Jr. and W. William Hodes, The Law of Lawyering 575–76 (1990) ("Where there is danger that the tribunal will be misled, a litigating lawyer must forsake his client's immediate and narrow interests in favor of the interests of the administration of justice itself.").

While Rule 3.3 articulates the duty of candor to the tribunal as a necessary protection of the decisionmaking process, *see* Hazard at 575, and Rule 3.4 articulates an analogous duty to opposing lawyers, neither of these rules nor the entire Code of Professional Responsibility displaces the broader general duty of candor and good faith required to protect the integrity of the entire judicial process. The Supreme Court addressed this issue most recently in *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). There, an attorney had taken steps to place certain property at issue beyond the jurisdiction of the district court and had filed numerous motions in bad faith, simply to delay the judicial process.

The district court, the court of appeals, and the Supreme Court all agreed that neither Federal Rule of Civil Procedure 11 (subjecting to sanction anyone who signs a pleading in violation of the standards imposed by the rule) nor 28 U.S.C. § 1927 (subjecting to sanction anyone who "multiplies the proceedings ... unreasonably and vexatiously") could reach the conduct. However, the Supreme Court accepted the district court's reliance on the inherent power to impose sanctions, rejecting arguments that Rule 11 and § 1927 reflect a legislative intent to displace a court's power to vacate a judgment upon proof that a fraud has been perpetrated upon the court:

> We discern no basis for holding that the sanctioning scheme of the statute [28 U.S.C. § 1927] and the rules displaces the inherent power to impose sanctions for the bad faith conduct described above. These other mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. First, whereas each of the other mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices.

[*Chambers,*] 501 U.S. at [46,] 111 S.Ct. at 2134 (emphasis added).

The general duty of candor and truth thus takes its shape from the larger object of preserving the integrity of the judicial system. For example, in *Tiverton Board of License Commissioners v. Pastore,* 469 U.S. 238, 105 S.Ct. 685, 83 L.Ed.2d 618 (1985), counsel failed to apprise the Supreme Court that during the appeal process, one of the respondents,

a liquor store challenging the admission of evidence at a Rhode Island liquor license revocation proceeding, had gone out of business, rendering the case moot. Rebuking counsel for failing to comply with a duty of candor broader than Rule 3.3, the Supreme Court stated, "It is appropriate to remind counsel that they have a 'continuing duty to inform the Court of any development which may conceivably affect the outcome' of the litigation." *Id.* at 240, 105 S.Ct. at 686 (quoting *Fusari v. Steinberg,* 419 U.S. 379, 391, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) (Burger, C.J. concurring)) (emphasis added).

The general duty to preserve the integrity of the judicial process was similarly identified in *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). Without the support of any rule, the Court opened up a longstanding judgment because one of the litigants had introduced a document at trial which was later discovered to be fraudulent. The Supreme Court stated,

> It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that *preservation of the integrity of the judicial process* must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

*Id.* at 246, 64 S.Ct. at 1001 (emphasis added).

*Shaffer Equip., Co.,* 11 F.3d at 457–59; *see also Aptix Corp. v. Quickturn Design Sys., Inc.,* 269 F.3d 1369, 1379 (Fed.Cir.2001) ("The duty of candor to the court is entitled to at least as much honor as that to the PTO.") (Mayer, C.J., dissenting).

### 2. Duty of Candor—Related Proceedings

 This general and rule-based duty of candor finds application, among other places, in cases where two related matters are being adjudicated without counsel notifying each adjudicator of the related matter. A patent infringement suit with an invalidity counterclaim, and an IPR proceeding involving the validity of the same patent claims, fit into that category of related matters requiring notification to the respective adjudicative tribunals. At least one other court has found the duty of candor applicable in such circumstances. *Rensselaer,* 2014 WL 201965, at *5, 2014 U.S. Dist. LEXIS 5186, at *16. In *Rensselaer,* the district court explained that "[w]hile Apple filed its IPR petition on October 21, 2013, it was not until December 9, 2013, that it requested permission to bring the instant motion [to stay], which was filed on December 23, 2013." *Id.* The court noted that in the interim, Apple had participated in a telephone conference with the court and "neglected to inform the court and plaintiffs that it had submitted an IPR petition to the PTO." *Id.* The *Rensselaer* court also noted that, during a hearing on the motion to stay, "Apple did not offer a particularly persuasive reason *for its lack of candor* with the court and plaintiffs during the telephone conference regarding the fact that it had filed an IPR petition." *Id.* (emphasis added).

In addition to such directly analogous case, federal courts in non-patent cases have long-recognized the existence of a duty of candor when related cases are simultaneously pending in different courts. In *Cleveland Hair Clinic, Inc. v. Puig,* 200 F.3d 1063, 1067–68 (7th Cir.2000), an attorney appearing before a federal district court failed to disclose a state lawsuit he

had prepared and was having simultaneously filed. Noting the Supreme Court's admonition that counsel have a continuing duty to inform the Court of any development which may conceivably affect the outcome of the litigation, *Pastore*, 469 U.S. at 240, 105 S.Ct. 685, and the Illinois Rule 3.3 duty of candor, the Seventh Circuit observed that "[t]he goal of the state lawsuit was to cut off the federal court at the pass, a development that surely could have affected the outcome of the litigation pending in federal court." *Cleveland Hair Clinic*, 200 F.3d at 1067–68.

In another case involving related litigation, *Calleros v. FSI Int'l, Inc.*, 892 F.Supp.2d 1163, 1165 (D.Minn.2012), the plaintiff shareholder filed a suit in federal district court alleging that the defendant corporation, its officers, and directors, violated the Securities Exchange Act and their fiduciary duties by mailing incomplete and misleading disclosures in connection with a proposed tender offer by another company. However, the plaintiff shareholder failed to advise the district court that another shareholder had filed a class-action suit in state court alleging that the same corporation's officers and directors violated their fiduciary duties by making incomplete and misleading disclosures in connection with the proposed transaction, and that two other similar state court class actions had also been filed. *Id.* at 1166. The district court noted that "[t]ellingly absent from [plaintiff's] Motion papers is *any* reference to the state-court cases raising nearly identical issues to the instant action." *Id.* at 1167. In deciding to stay its proceedings in favor of the related state court litigation, the district court observed that it was "troubled by the failure to mention the related state-court litigation," since " '[a]ttorneys, as officers of the court, have the responsibility to present the record with accuracy and candor.' " *Id.* at 1168 n. 6 (quoting

*Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 826 (8th Cir.1992)). The district court concluded that "[i]t seems fairly apparent that counsel have flouted that obligation here." *Id.; see also Perez v. Sanford–Orlando Kennel Club, Inc.*, 518 F.3d 1302, 1303 (11th Cir.2008) (admonishing an attorney who failed to advise court of potentially jurisdiction-stripping events taking place before oral argument and then asking court to vacate opinion after losing his case).

This duty has also been applied in a non-patent context where there were federal district court proceedings and related administrative proceedings pending at the same time. In *U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 540 F.Supp.2d 994 (N.D.Ill. 2008) (hereinafter *"Lake Shore"*), the district court was faced with a situation involving a simultaneous administrative proceeding of which it was not informed. The district court, in a futures trading matter, had granted plaintiff's request for a statutory restraining order freezing defendant's assets, which order was later vacated by the Seventh Circuit's mandate. *Id.* at 996–97. "During this time period, unbeknownst to the court, the National Futures Association ("NFA"), which is not a party to this action, was working to freeze Lake Shore Ltd.'s assets via a completely different route by filing a member responsibility action ("MRA")." *Id.* at 997. Shortly after the Seventh Circuit vacated the district court's order, the NFA issued an asset freeze, which the district court learned of the same day when Lake Shore Ltd. filed an "emergency motion to enforce mandate." *Id.* The motion alleged that the federal statutorily-established NFA administrative action, which Lake Shore Ltd. had never previously mentioned to the district court or the Seventh Circuit, had been issued in violation of the Seventh

Circuit's mandate and opinion. *Id.* The district court's opinion summarizing these events relied on both *Cleveland Hair Clinic* and *Pastore* in noting that it was "unclear why none of the lawyers in this case told the court about the NFA member responsibility action prior to the issuance of the NFA asset freeze order, given that the preliminary injunction sought to freeze the very same assets at issue in the NFA action." *Id.* at 997 n. 1.

### 3. Application of Duty of Candor to this Case

■ The context in which this Court learned of the related IPR litigation was slightly different from that in *Rensselaer*, and similar to that in *Lake Shore*, in that both VIS and Samsung knew of the September 2013 filing of the IPR petition, but neither of them informed the Court for six months. It was not until the PTAB ruled on institution, and VIS filed its motion to reconsider, that the Court was made aware of such concurrent proceeding. Of course, at the same time that Defendants were petitioning the PTAB for an adjudication of the validity of the patents at issue in this case, and Plaintiff was actively opposing such petitions, Defendants were also asking this Court to adjudicate the validity of the same patents and Plaintiff was actively opposing such efforts.

At the April 10, 2014 hearing before this Court on the motion to reconsider, the Court raised the issue of the parties' failure to notify the Court that they had begun the IPR proceeding. Hr'g Tr., ECF. No. 554. Counsel for each of the parties responded that it never occurred to them that they should advise this Court of such parallel proceeding. Even after the Court noted that the AIA provides that, after a final written decision by the PTAB,

a petitioner is collaterally estopped from later asserting in a civil action that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during the *inter partes* review, Defendants seemed to suggest that they did not think to notify this Court of the IPR proceeding because this Court's docket moved so quickly. Hr'g Tr. 13, ECF No. 554.

■ The existence of such a parallel proceeding normally comes to the attention of the Court through one of the parties filing a motion to stay court proceedings in light the request for institution of IPR. *See Universal Elecs., Inc.*, 943 F.Supp.2d at 1030 (considering such a stay motion). However, that did not take place here. Had the parties promptly notified this Court of the pending petition, then the Court at least could have considered for itself what impact such related proceeding might have on the scheduling of matters,[7] as well as whether it wished to stay the proceedings and its then-ongoing consideration of Defendants' summary judgment motion of invalidity. After all, "[a] stay is particularly appropriate, and within the court's 'sound discretion,' where the outcome of another case may 'substantially affect' or 'be dispositive of the issues' in a case pending before a district court." *MEI, Inc. v. JCM Am. Corp.*, Civ. No. 09–351, 2009 WL 3335866, at *4, 2009 U.S. Dist. LEXIS 96266, at *12–13 (D.N.J. Oct. 15, 2009) (quoting *Bechtel Corp. v. Local 215, Laborers' Int'l Union of North America*, 544 F.2d 1207, 1215 (3rd Cir.1976)); *see Brixham Solutions Ltd. v. Juniper Networks, Inc.*, Civ. No. 13–CV–616–JCS, 2014 WL 1677991, at *1–2, 2014 U.S. Dist. LEXIS 58770, at *3–7 (N.D.Cal. April 28,

---

7. Had the Court known of the pending IPR proceeding on October 25, 2013, when it rescheduled the trial from November 12, 2013 to April 21, 2014, it could have factored such knowledge into its scheduling decision.

2014) (granting motion to stay patent infringement suit involving non-practicing entity pending *inter partes review*); *see also Gould v. Control Laser Corp.*, 705 F.2d 1340, 1341 (Fed.Cir.1983) (discussing trial court stay of patent infringement litigation during reexamination proceedings). Moreover, such stays may be initiated *sua sponte*. *See Crown Cent. Petroleum Corp. v. Dep't of Energy*, 102 F.R.D. 95, 98 (D.Md.1984) ("A federal court has inherent power to stay, *sua sponte*, an action before it.") (citing *Landis v. North Am. Co.*, 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936)). And while, as Plaintiff has frequently noted, it is true that trials resolve cases, it is also true that a "final written decision" from the PTAB has preclusive effect and should therefore resolve cases. *See* 35 U.S.C. §§ 315(e), 318, and 319.

By failing to advise this Court of the existence of the IPR proceedings, VIS and Samsung in effect had two bites at the apple regarding the validity of the disputed claims. Moreover, they deprived this Court of the opportunity to inquire of the parties and decide for itself whether to await a ruling from the PTAB on that issue. As the PTO noted in issuing its new rules of practice implementing the AIA, it was "anticipated that the rules will minimize duplication of efforts.... By requiring the filing of an *inter-partes* review petition earlier than a request for *inter-partes* reexamination, and by providing shorter timelines for *inter-partes* review

compared with reexamination, it is anticipated that the current high level of duplication between litigation and reexamination will be reduced." 77 Fed.Reg. 48680, 48721. Needless to say, the practice adopted by the parties does not lend itself to promoting judicial efficiency or accomplishing some of the purposes Congress obviously intended with enactment of the AIA. Moreover, such practice may work a hardship on an entire district that seeks to expeditiously resolve its docket.

The parties should have notified this Court of the IPR petition as soon as it was filed, and the failure to do so appears, at least to the undersigned Judge, to have been a glaring omission. By not notifying the Court, counsel have, at the very least, failed to comply with their general duty of candor and good faith to this Court because the IPR proceeding was clearly a "development which may conceivably affect the outcome of the litigation"—a fact best demonstrated by Plaintiff's filing of the motion for reconsideration. *Pastore*, 469 U.S. at 240, 105 S.Ct. 685.[8] However, in light of the undeveloped state of the law on this relatively new PTO review procedure, this Court's admonition of all counsel involved in this case falls short of a formal reprimand of any of the individual lawyers.[9] That said, the issuance of this Opinion is more than sufficient to place all patent practitioners on notice that future failures to disclose to the Court *any* con-

---

**8.** In light of the Court's conclusion regarding the general duty of candor, it is not necessary for this Court to engage in further analysis regarding the Rule 3.3 duty of candor.

**9.** Although the replacement of *inter partes* reexamination by *inter partes* review effected a transformation from an examinational to an adjudicative proceeding, thus making the existence of concurrent PTO review proceedings more similar to the concurrent *litigation* cases discussed above, the prior reexamina-

tion process was still a related administrative proceeding that could "conceivably affect the outcome of the litigation." *Pastore*, 469 U.S. at 240, 105 S.Ct. 685. Accordingly, although the question is not squarely before this Court, there is a strong argument that even under the old inter partes reexamination process, the general duty of candor required parties to notify the Court of the filing of a petition for reexamination.

current *inter partes* review proceedings will be met with far sharper consequences.

Like the *Lake Shore* court, this Court "takes its obligation to promote civility and collegiality between the bench and bar very seriously," and only "prepared this opinion after a great deal of reflection." *Lake Shore*, 540 F.Supp.2d at 996. However, the Court "cannot turn a blind eye to conduct that negatively impacts its ability to promote the orderly administration of justice and resolve disputes fairly." *Id.* It is this Court's hope that shining light on this issue will remind counsel in this case, and others, of their continuing duty to inform the Court of any development which may conceivably affect the outcome of the litigation. *Pastore,* 469 U.S. at 240, 105 S.Ct. 685. The Court now moves on to address the standard applicable to the motion to reconsider, as well as the substance of such motion.

## III. STANDARD OF REVIEW— RECONSIDERATION

 Because the motion for reconsideration is a procedural matter not unique to patent law, when considering such a motion, this Court looks to controlling Fourth Circuit precedent, rather than Federal Circuit precedent. *Bowling v. Hasbro,* 403 F.3d 1373, 1375 (Fed.Cir. 2005); *Pennington Seed, Inc. v. Produce Exchange No. 299,* 457 F.3d 1334, 1340 n. 2 (Fed.Cir.2006). Controlling Fourth Circuit law clearly provides that a summary judgment order, like the January 8, 2014 summary judgment Order at issue, "which did not resolve all claims against all parties, was interlocutory and thus subject to revision at any time." *Saint Annes Dev. Co., Inc. v. Trabich,* 443 Fed.Appx. 829, 832 (4th Cir.2011) (citing Fed.R.Civ.P. 54(b)). While final orders trigger heightened standards for reconsideration, *see* Fed.R.Civ.P. 59(e) and 60(b), interlocutory orders, such as orders of partial summary judgment, are not subject to those strict standards because " '[a] district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted.' " *Saint Annes Dev. Co.,* 443 Fed. Appx. at 832 (quoting *American Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 514–15 (4th Cir.2003)); *see* Fed. R.Civ.P. 54(b) (providing that interlocutory orders that resolve fewer than all claims are "subject to revision at any time before the entry of [final] judgment"); *Fayetteville Investors v. Commercial Builders, Inc.,* 936 F.2d 1462, 1469 (4th Cir.1991) (same). The differing standards for interlocutory versus final orders are understandable, as significant time and resources are often invested in arriving at a final judgment. *American Canoe Ass'n,* 326 F.3d at 514.

 The power to reconsider an interlocutory ruling "is committed to the discretion of the district court, ... and doctrines such as law of the case ... have evolved as a means of guiding that discretion." *Id.* at 515 (citing *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 12, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), *Sejman v. Warner–Lambert Co., Inc.,* 845 F.2d 66, 69 (4th Cir.1988)). A court's earlier decisions become law of the case and must generally be followed unless: "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *Sejman,* 845 F.2d at 69 (internal quotation marks omitted); *see American Canoe Ass'n,* 326 F.3d at 515 (explaining that although it is the "ultimate responsibility of [all levels of] the federal courts ... to

reach the correct judgment under law, ... that obligation may be tempered at times by concerns of finality and judicial economy").

 The law of the case doctrine, which guides this Court's reconsideration decision, "is not an 'inexorable command' but rather a prudent judicial response to the public policy favoring an end to litigation." *Sejman*, 845 F.2d at 68–69 (citations omitted). "As most commonly defined, the doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (internal citation and quotation marks omitted). The doctrine is "basically [a] simple principle of disciplined self-consistency" based on principles of finality and comity, as opposed to a lack of authority.[10] 18B Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4478 (2d ed.2002). Stated differently, "[l]aw-of-the-case principles ... are a matter of practice that rests on good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards." *Id.; see Christianson*, 486 U.S. at 816 n. 5, 108 S.Ct. 2166 ("Perpetual litigation of any issue ... delays, and therefore threatens to deny, justice."). It is a simple but unavoidable reality that district courts could not effectively and efficiently satisfy their responsibilities if every ruling were open to reconsideration based on better crafted legal argument. *See Hilb Rogal &*

*Hobbs Co. v. Rick Strategy Partners, Inc.*, No. 3:05cv355, 2006 WL 5908727, at *8 (E.D.Va. Feb. 10, 2006) ("Courts will not typically reconsider an interlocutory order where the motion to reconsider simply seeks 'to present a better and more compelling argument that the party could have presented in the original briefs.'" (quoting *Madison River Mgmt. Co. v. Business Mgmt. Software Corp.*, 402 F.Supp.2d 617, 619 (M.D.N.C.2005))); 18B Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4478.1 (2d ed. 2002) ("A trial court could not operate if it were to yield to every request to reconsider each of the multitude of rulings that may be made between filing and final judgment."); *see also Sejman*, 845 F.2d at 69 ("Clearly, courts could not perform their duties 'satisfactorily and efficiently ... if a question once considered and decided ... were to be litigated anew'" in subsequent appeals, (quoting *Great Western Tel. Co. v. Burnham*, 162 U.S. 339, 344, 16 S.Ct. 850, 40 L.Ed. 991 (1896))).

 Of course, "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision 'was clearly erroneous and would work a manifest injustice.'" *Christianson*, 486 U.S. at 817, 108 S.Ct. 2166 (quoting *Arizona v. California*, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). In line with *Christianson*, the Fourth Circuit has expressly recognized that a court may "depart[ ] from the law of

---

**10.** "The force of law-of-the-case doctrine is affected by the nature of the first ruling and by the nature of the issues involved. If the ruling is avowedly tentative or the issues especially important, it may be said that law-of-the-case principles do not apply. Different parties in separate proceedings likewise may

fall outside law-of-the-case constraints.... Matters of fact, on the other hand, are unlikely candidates for reconsideration after the first full effort." 18B Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4478.5 (2d ed.2002).

the case when [a] previous decision [i]s 'clearly erroneous and would work manifest injustice.'" *TFWS, Inc. v. Franchot,* 572 F.3d 186, 192 (4th Cir.2009) (quoting *United States v. Aramony,* 166 F.3d 655, 661 (4th Cir.1999)). In applying such exception to the law of the case doctrine, the Fourth Circuit explained that "[a] prior decision does not qualify for this ... exception by being just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Id.* at 194 (internal citations and quotation marks omitted). In other words, "[i]t must be 'dead wrong.'" *Id.* (citations omitted).

Accordingly, having determined that the above-described discretionary standard for reconsideration is the correct standard in the instant circumstances, the Court turns to the substantive analysis of the issues raised in the parties' briefs.

## IV. DISCUSSION

■■■ Plaintiff's motion seeking reconsideration asserts that this Court should consider the recent PTAB decisions regarding institution to be "new evidence" and should give deference to the PTAB's findings due to the specialized knowledge and expertise of the PTO. Pl.'s Reconsideration Mem. 4, ECF No. 417 (citing *Power-Oasis, Inc. v. T–Mobile USA, Inc.,* 522 F.3d 1299, 1304 (Fed.Cir.2008)). Defendants respond by arguing that the Court need not accord the decisions by the PTAB deference because "a decision by the USP-TO that claims are valid over prior art is *'never binding* on the court.'" Defs.' Opp. Mem. 7, ECF No. 465 (quoting *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985) (emphasis added by Defendants)). Defendants further assert that no deference should be accorded the PTAB's decisions because they are only decisions regarding whether to institute

IPR, not final decisions after PTAB adjudication. Moreover, Samsung argues that even these preliminary decisions to institute IPR, or not to institute IPR, are initial rulings subject to rehearing. *Id.* at 7–8. VIS replies by asserting that its position is not that the PTAB rulings are *binding* on this Court, but that they should be afforded deference as a matter of law. Pl's Rebuttal Mem. 2, ECF No. 475 (citing *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed.Cir.1984) *abrogated on other grounds by Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276, 1288–90 (Fed.Cir.2011) (en banc)).

These assertions by Plaintiff seem to rely on the first two *Sejman* factors that our Court of Appeals directs district courts to utilize in deciding whether to reconsider an interlocutory ruling. *Sejman,* 845 F.2d at 69. However, the first of the three *Sejman* factors described above is not present in this case because no "subsequent trial produce[d] substantially different evidence" such that this Court should not follow its earlier decision. *Id.* No trial has taken place in *this* case. *See Lincoln Nat'l Life Ins. Co. v. Roosth,* 306 F.2d 110, 113 (5th Cir.1962) (clearly referencing subsequent trial in same case as original decision in describing factor *Sejman* adopted). Therefore, there is no different evidence produced by "a trial" in *this* case. Moreover, even if the Court were to broadly construe the submission to the Court of the PTAB decisions as falling within the ambit of the first *Sejman* factor, such PTAB decisions still do not satisfy the first factor. As discussed more fully below, a decision on IPR institution is merely a threshold determination as to whether, using the broadest reasonable interpretation of the claim terms, the petitioner has demonstrated that there is a reasonable likelihood of the patent claims being found invalid by a preponderance of the evidence.

37 C.F.R. § 542.100(b); 35 U.S.C. § 314(a); 35 U.S.C. § 316. As such, it is not a "trial" producing "evidence."

## A. Deference Owed to PTAB's Decisions

▮▮▮ Having determined that there is no subsequent trial producing substantially different evidence, the Court moves on to the second *Sejman* factor, and asks whether controlling authority has since made a contrary decision of law applicable to the issue at hand, such that the Court should not follow its earlier decision. *Sejman*, 845 F.2d at 69. PTO decisions regarding patentability can have a direct effect on pending litigation because the power to grant a patent is not one afforded to the courts, but is strictly within the domain of the PTO. *See Patlex Corp. v. Mossinghoff,* 758 F.2d 594, 604 *on reh'g,* 771 F.2d 480 (Fed.Cir.1985) ("Validity often is brought into question in disputes between private parties, but the threshold question usually is whether the PTO, under the authority assigned to it by Congress, properly granted the patent. At issue is a right that can only be conferred by the government." (citing *Crowell v. Benson,* 285 U.S. 22, 50, 52 S.Ct. 285, 76 L.Ed. 598 (1932))). The Court therefore generally gives deference to final PTO decisions, based in part on the PTO's specialized knowledge and expertise. *See PowerOasis, Inc.,* 522 F.3d at 1304 (indicating that when the validity of an issued patent is challenged, and " 'no prior art other than that which was [originally] considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.' " (quoting *Am. Hoist & Derrick Co.,* 725 F.2d at 1359–60)). Moreover, the Court is required to give a certain level of deference to the PTO based on 35 U.S.C. § 282, which provides that a duly issued patent is *presumed valid,* and the Federal Circuit has recognized that such "statutory presumption derives in part from recognition of the technological expertise of the patent examiners." *Interconnect Planning Corp.,* 774 F.2d at 1139.

▮▮▮ Notwithstanding such presumption and the associated deference, when the validity of a patent is challenged in federal court, a district court has "the obligation ... to reach an independent conclusion," regarding validity, and a prior decision by a patent examiner, whether it be on an original patent application or a reissue application, " 'is never binding on the court.' " *Id.* (quoting *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d 1549, 1555 (Fed.Cir.1985)). Rather, the examiner's decision is merely " 'evidence the court must consider in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence.' " *Id.* (quoting *Fromson,* 755 F.2d at 1555).

In light of the fact that prior final PTO decisions affirming patentability are not controlling in a subsequent validity challenge in this Court, a decision by the PTO regarding whether to institute IPR certainly does not have binding effect on the Court. Moreover, even if the Court assumes that a *prior final* PTAB decision as to patentability, could somehow be binding on a district court, such rule surely would not make *subsequent non-final* PTAB decisions to institute, or not to institute IPR proceedings, retroactively binding on a district court. Accordingly, while the Court has the discretion to consider the recent

PTAB rulings, they are not "controlling authority" reaching a decision contrary to this Court's decision, *Sejman*, 845 F.2d at 69, and the Court is therefore certainly not required to overturn its prior decision based on the analysis in a decision by the PTAB granting or denying institution of IPR.

## B. Impact of Differing Standards at PTAB and the Court

■ The Court now moves on to consider the third and final *Sejman* factor, asking whether its "prior decision was clearly erroneous and would work manifest injustice." *Sejman*, 845 F.2d at 69. Any deference this Court might decide to accord PTAB analysis in determining whether the Court's prior decision was clearly erroneous and would work manifest injustice, such that it required reconsideration of the summary judgment Order, is tempered by the contrast between the claim constructions and other legal standards used by the PTAB and those used by this Court. In determining whether to institute IPR, the PTAB must determine whether, using the *broadest reasonable interpretation* of the claim terms, the petitioner has demonstrated that there is a *reasonable likelihood* of the patent claims being found invalid by a preponderance of the evidence. 37 C.F.R. § 42.100(b); 35 U.S.C. § 314(a); 35 U.S.C. § 316. In contrast, when construing a disputed patent's claim terms, the Court adopts a construction based on what a person having *ordinary skill in the relevant art* would understand the claims to mean as of the time of invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.Cir.2005). Once the

claim terms have been construed, the Court determines whether the claims have been proven invalid by *clear and convincing evidence*. *Microsoft Corp. v. i4i Ltd. P'ship*, —— U.S. ——, 131 S.Ct. 2238, 2246, 180 L.Ed.2d 131 (2011).

■ Indeed, the PTAB recognized these differing standards when it granted VIS's motion to submit to the PTAB this Court's January 8, 2014 summary judgment Order. The PTAB stated that "[a]lthough the district court's order may be informative, the Board applies a claim construction standard that may not be the same as that adopted by a district court, and the Board may reach a different result." Feb. 12, 2014 PTAB Order, Paper No. 12, Case Nos. IPR2013–00569, IPR2013–00570, IPR2013–00571; February 12, 2014 Order by PTAB, Paper No. 13, Case Nos. IPR2013–00572, IPR2013–00573. Thus, it is not surprising that in construing the specific claim term, "converted video signal," the term upon which VIS rests its entire argument for reconsideration, the PTAB reached a claim construction meaningfully different from the construction adopted by this Court in its *Markman* Opinion. *Markman* Opinion, 976 F.Supp.2d at 819, ECF No. 198 (giving the term "converted video signal" its plain and ordinary meaning, which is "a video signal that has been changed."); Summary Judgment Order 726–27, ECF No. 413 (reaffirming the Court's construction of the term in its *Markman* Opinion); *cf.* Pl.'s Reconsideration Mem. Ex. 1 at 15, ECF No. 417–2 (reflecting the PTAB's definition of "convert" as "to change the representation of data from one form to another").[11]

---

11. Furthermore, VIS's attempt to argue that the claim constructions reached by the PTAB and the Court are consistent, Pl.'s Rebuttal Mem. 4, ECF No. 475, when they clearly are not, is merely an argument for a new claim construction in this case different from the

construction which *VIS argued for* during the *Markman* process and which *the Court subsequently adopted* in its *Markman* Opinion. It is well-settled that "one cannot interpret a patent one way for the validity analysis and a different way for the infringement analysis."

As the PTAB applied a different claim construction standard, and different standards of law, to reach its differing decision as to whether a specific prior art reference would likely disclose the claim limitation of a "converted video signal," VIS has failed to show that this Court's prior ruling on summary judgment was clearly erroneous or that it would work a manifest injustice if it is not revised. *Sejman*, 845 F.2d at 69; *Franchot*, 572 F.3d at 192 (quoting *Aramony*, 166 F.3d at 661).

Moreover, Plaintiff's attempt to get a second bite at the apple of invalidity, by arguing that this Court's earlier decision was clearly erroneous, undermines the principles of finality and comity on which the law of the case doctrine is grounded. The arguments and evidence presented to the PTAB, which were different than the arguments and evidence presented to this Court, necessarily informed the PTAB analysis and the conclusions which Plaintiff argues the Court should now adopt. However, the Court may not adopt the record presented to a separate tribunal for the facts therein. *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994) (recognizing that a " 'court may take judicial notice of a document filed in another court *not for the truth of the matters asserted* in the other litigation, but rather to establish *the fact of such litigation* and related filings.' " (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir.1992))); *United States v. Rosga*, 864 F.Supp.2d 439, 447 (E.D.Va.2012) ("Thus, for example, a court may 'notic[e] the content of court records,' *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir.1989), but 'only for the limited purpose of recognizing the "judicial act"

that the order represents or the subject matter of the litigation.' " *Jones*, 29 F.3d at 1553). Additionally, Plaintiff does not assert that the evidence presented to the PTAB by the parties to this litigation was unavailable at the time VIS filed its briefs on summary judgment regarding validity. Rather, Plaintiff only asserts that the PTAB had not yet rendered a decision favorable to VIS at the time it submitted its summary judgment briefs in this case. Pl's Reconsideration Mem. 2, ECF No. 417.

To allow reconsideration of an interlocutory order based upon the *subsequent* decision of another adjudicative tribunal— which was driven by a different claim construction, different arguments by the parties, different evidence, and a different legal standard—would remove all considerations of finality and consistency by allowing parties to challenge a court's ruling whenever that party identifies, in hindsight, an improved legal argument. *See Hilb Rogal & Hobbs Co.*, 2006 WL 5908727, at *8 ("Courts will not typically reconsider an interlocutory order where the motion to reconsider simply seeks 'to present a better and more compelling argument that the party could have presented in the original briefs.' " (quoting *Madison River Mgmt. Co.*, 402 F.Supp.2d at 619)); 18B Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4478.1 (2d ed. 2002) ("A trial court could not operate if it were to yield to every request to reconsider each of the multitude of rulings that may be made between filing and final judgment."); *see also Sejman*, 845 F.2d at 69 ("Clearly, courts could not perform their duties 'sat-

---

*A.G. Design & Assocs. LLC v. Trainman Lantern Co., Inc.*, 271 Fed.Appx. 995, 999 n. 4 (Fed.Cir.2008); *see Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed.Cir.2001) ("A patent may not, like a

"nose of wax," be twisted one way to avoid anticipation and another to find infringement.") (quotation marks and citation omitted).

isfactorily and efficiently ... if a question once considered and decided ... were to be litigated anew' " in subsequent appeals, (quoting *Great Western Tel. Co.*, 162 U.S. at 344, 16 S.Ct. 850)).

Finally, even if the Court reconsidered its prior summary judgment order in light of the PTAB's decisions regarding institution of IPR, the Court would arrive at the same conclusions. In its *Markman* Opinion, the Court adopted the construction of the term "converted video signal" proposed by VIS, and, based on what a person having ordinary skill in the art would understand the claims to mean at the time of invention, gave the term its ordinary and plain meaning—"a video signal that has been changed." *Markman* Opinion, 976 F.Supp.2d at 815 & 819, ECF No. 198. Therefore, when analyzing the asserted claims of the '268 patent for validity in light of the prior art reference "Palin," the Court used this construction of the term "converted video signal." In contrast to this Court's claim construction, the PTAB applied the "broadest reasonable interpretation" standard to the differing evidence and argument before it and adopted a construction of the term "converted video signal" which defined "convert" as "to change the representation of data from one form to another, for example to change numerical data from binary to decimal or from cards to tape." Pl.'s Reconsideration Mem., Ex. 1 at 15, ECF No. 417–1. Applying the construction adopted

by this Court, and *not* the contrary construction adopted by the PTAB, the Court is confident that its decision in the original summary judgment Order was the correct one. The prior art reference "Palin" discloses a video signal which has been changed and, thus, anticipates the claim term of a "converted video signal." *See* Summary Judgment Order at 731–32, ECF No. 413. That the PTAB arrived at a different conclusion when using a different claim construction does not serve to prove the Court's conclusion erroneous.[12]

For the reasons stated above, although this Court plainly has authority to reconsider the summary judgment Order, it declines to do so, based on considerations of finality, consistency, and comity, as well as the procedural posture of this case. Accordingly, Plaintiff's motion for reconsideration of the Court's summary judgment Order, ECF No. 416, is **DENIED**.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Reconsideration is **DENIED**. The Court reiterates for the benefit of counsel in this case, and counsel in all future patent cases, that a lawyer's general duty of candor to the Court requires counsel to timely notify the Court of requests to the PTO for institution of *inter partes* review when such request has the potential to affect the outcome of the concurrent litigation.

---

12. The Court notes that Defendants separately opposed the motion for reconsideration through arguing that the motion was moot because none of the patent claims potentially affected by the PTAB's rulings are among those claims Plaintiff elected to assert at trial. Defs.' Opp. Mem. 13–14, ECF No. 465. While this is factually a true statement, it misses the potential indirect, but no less significant, impact that the instant motion could have on the trial, because some of the claims elected by VIS are dependent claims that rely on claims that were previously invalidated by this Court. Accordingly, as VIS correctly asserts, the reversal of such invalidation would necessarily impact the trial evidence Samsung would have to introduce in order to prove the invalidity of the dependent claim elected by VIS. Pl's Rebuttal Mem. 5, ECF No. 475. Thus, as the motion for reconsideration has the potential to impact the litigation of at least one of the claims Plaintiff has elected to assert at trial, the motion is not moot.